MILLER'S POND COMPANY, LLC, ET AL. *v.*
CITY OF NEW LONDON ET AL.
(SC 17166)

Sullivan, C. J., and Borden, Norcott, Palmer and Vertefeuille, Js.

Argued January 7—officially released June 7, 2005

*Ben A. Solnit*, for the appellants (plaintiffs).

*Michael P. Carey*, with whom was *John J. Radshaw III*, for the appellees (defendants).

*Opinion*

NORCOTT, J. The principal issue in this appeal is whether the trial court properly determined that the defendants, the city of New London (city), the New London water and water pollution control authority (New London water authority), the town of Waterford, and the Waterford water pollution control authority (Waterford water authority), are immune from antitrust liability under General Statutes § 35-31 (b)[1] because their alleged anticompetitive activities were "specifically directed or required" by statute with respect to the wholesale water market in the New London area. The plaintiffs, Miller's Pond Company, LLC (Miller's Pond Company), Gary Saunders and Thomas Schacht,[2] appeal[3] from the judgment of the trial court following its grant of the defendants' motion for summary judgment. They contend that the trial court improperly: (1) applied § 35-31 (b), which exempts certain activities from the Connecticut Antitrust Act, General Statutes § 35-24 et seq., when those activities are "specifically directed or required by a statute of this state, or of the United States," to the facts of the present case; and (2) granted the defendants' motion for summary judgment because there are unresolved factual issues about the definition of the relevant market. As an alternate ground for affirming the trial court's decision, the defendants con-

[1] General Statutes § 35-31 (b) provides: "Nothing contained in this chapter shall apply to those activities of any person when said activity is specifically directed or required by a statute of this state, or of the United States."

[2] Saunders is a founding member of Miller's Pond Company, LLC, and Schacht is a managing member of that company.

[3] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and upon the unopposed motion of the defendants, we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

tend that General Statutes § 35-44b[4] requires us to apply the broader federal case law principles governing state action antitrust immunity that have evolved from the United States Supreme Court decision in *Parker* v. *Brown*, 317 U.S. 341, 350–51, 63 S. Ct. 307, 87 L. Ed. 315 (1943). We reverse the judgment of the trial court and remand the case for further proceedings.

The record reveals the following facts and procedural history.[5] The defendants own water sources and water treatment, transmission and distribution facilities that serve the city, Waterford and other parts of southeastern Connecticut; the New London water authority and the Waterford water authority are the "two dominant water utilities" in southeastern Connecticut. The defendants own every source of freshwater and all related supply facilities that are located within their municipal borders and "capable of serving the [r]egion," except for Miller's Pond (pond), an approximately seventy-seven acre man-made lake located in the northeastern corner of Waterford. Miller's Pond Company owns and has exclusive riparian rights to the pond, which is served by several tributaries and receives water from a 9.83 square mile watershed, making it "the only signifi-

[4] General Statutes § 35-44b provides: "It is the intent of the General Assembly that in construing sections 35-24 to 35-46, inclusive, the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes."

[5] For purposes of their motion for summary judgment, the defendants admitted all of the factual allegations in the plaintiffs' complaint. The trial court, therefore, treated the defendants' motion for summary judgment as the equivalent of a common-law motion for judgment on the pleadings. See, e.g., *Sewer Commission* v. *Norton*, 164 Conn. 2, 5, 316 A.2d 775 (1972) (stating that motion for judgment on pleadings "requires a situation where the parties are willing to admit the facts and place their entire case on the legal issues raised, waiving the right to replead if the legal issue is decided against them" [internal quotation marks omitted]). Accordingly, for purposes of this appeal, we accept as undisputed the facts pleaded in the complaint, and unless otherwise noted, quotations from the record originate from that pleading.

cant untapped surface fresh water reservoir capable of supplying the relevant geographic market served by the defendants." That relevant market consists of the city, Waterford and portions of Montville and East Lyme, and may be expanded to include Groton, Ledyard, Preston and Norwich upon completion of a planned water interconnection loop.

Since 1988, the plaintiffs have been seeking to sell or develop the pond as a water source for utilities in the region or as a private water supply for industrial or recreational facilities. Indeed, in 1998, Miller's Pond Company entered into an agreement with the Connecticut Water Company to develop the sale and distribution of either raw or treated water from the pond in the New London region. The potential market in the region is controlled, however, by the defendants.

The city previously had supplied water to Waterford from sources owned and controlled by the city until December, 1986, when the long-term supply contract expired. During renegotiations of that agreement, Waterford informed the city that it intended to develop its own water supply system using the pond as the primary water source. The city opposed this plan, and in April, 1988, it imposed a moratorium on new water connections in Waterford, which was to remain in place until Waterford signed a new water service agreement with the city. Thereafter, Waterford abandoned its efforts to supply its water independently and, in October, 1988, it signed a new agreement for a term of forty-eight years (1988 agreement).

The 1988 agreement defined the water supply relationship between the city and Waterford. Its stated purpose is "to provide the terms and conditions pursuant to which (1) the [c]ity will supply water to water consumers in [Waterford]; (2) other municipalities in New London County may have the opportunity to receive

water from the [c]ity through the [s]upply [f]acilities, [t]ransmission [f]acilities and [d]istribution [f]acilities in [Waterford] and the [c]ity; and (3) the [c]ity and [Waterford] will negotiate in good faith toward the goal of a [r]egional [w]ater and/or [s]ewer [s]ystem. This [a]greement provides for the use of the [d]istribution [f]acilities in [Waterford] and for the use of the [s]upply [f]acilities and [t]ransmission [f]acilities owned or controlled by the [c]ity to provide water to water consumers in [Waterford]." The agreement also states that "[t]he [c]ity and [Waterford] will use their best efforts to deter the construction and operation of new [i]ndependent [w]ater [s]ystems in the [c]ity and [Waterford] respectively."[6] The 1988 agreement defines an " '[i]ndependent [w]ater [s]ystem' " as "any private water company or system, private community water system, or private community well serving more than one water consumer."

The city also has an agreement to supply water to portions of the town of Montville. By its terms, the agreement required Montville to enter into a separate agreement with Waterford for the use of Waterford supply facilities needed for the city to deliver water to Montville.[7] Waterford and Montville entered into this agreement in April, 1990 (1990 agreement). The 1990 agreement has several conditions that, inter alia, permit Montville to develop its own water sources only if that "development or purchase does not result in material depletion of any water resources of Waterford [or the

---

[6] The 1988 agreement also provides that, in the event that the city determines that a water shortage exists, Waterford "shall" make available "a suitable additional source of water supply," if possible. If there is no additional source available, the city may refuse to accept new applications for water service in both the city and Waterford until the supply reserves are replenished.

[7] The plaintiffs note that during the negotiation of the 1990 agreement, Waterford refused to allow the Faria Corporation, a major industry in Montville, to have access to water for fire protection purposes.

city] which are presently planned or existing; and . . . does not result in material depletion of any water resources of Waterford or [the city] which come into existence in the future and are located outside of Montville." The pond is the only property not already owned by the defendants that is subject to the restriction in the 1990 agreement, and the plaintiffs claim that the conditions in the 1990 agreement restrict their ability to market the pond to Montville as a regular or emergency water supply.

In regulatory submissions to the department of public health addressing planning matters, both Waterford and the city have recognized the pond as an existing or future component of their water supply systems. The city included the pond in its plan in 1988 as a direct response to a notice from a realtor that the pond might be offered for sale on the open market.

As previously noted, the plaintiffs have been attempting to develop the pond either as a water source for the region or as a private supply for industrial or recreational facilities since 1988. They allege, however, that the defendants have, in accordance with the "best efforts to deter the construction and operation of new [i]ndependent [w]ater [s]ystems" clause in the 1988 agreement, interfered with their development efforts in a variety of ways. For example, in December, 1998, the plaintiffs and representatives from the Connecticut Water Company met with the New London water authority and offered to enter into an agreement to sell water to the city. The city rejected this offer and refused to deal; in February, 1999, the chief administrator of the New London water authority threatened to use eminent domain proceedings if the plaintiffs did not sell the pond to the city.[8] In April, 2000, Waterford, in accordance with

---

[8] The New London water authority reiterated its refusal to deal with the plaintiffs at a meeting in May, 2000. The chairman of the water authority told the plaintiffs that " '[w]e're the only game in [Waterford]. Forget going into the water business and forget the Connecticut Water Company.' "

its officials' understanding of the "best efforts" clause in the agreement, similarly refused to deal with the plaintiffs.

In February, 1998, the city filed an application with the department of environmental protection to divert waters from Hunts Brook, which is located upstream from the pond. Had that department granted this application, it would have reduced the flow of water into the pond by approximately 8 million gallons per day, and reduced the safe yield of the pond by one third. In May, 1998, the plaintiffs announced their intention to develop the pond similarly, and subsequently, in November, 1998, they filed their own application with the department of environmental protection to develop the pond as a regional water supply source and to dredge the valuable sand and gravel deposits from the basin. The department of environmental protection rejected this application without prejudice in October, 1999, because neither the city nor Waterford, as potential users of the water, had agreed to endorse the plaintiffs' application or join it.

In December, 1998, the department of environmental protection informed the city that its diversion application was incomplete, and instructed it to report on alternatives to the diversion of Hunts Brook, including obtaining water from the pond as well as from other nearby towns such as Groton and Norwich.[9] Consistent with the 1988 agreement, the city has continued to refuse to discuss obtaining water from the pond, the plaintiffs or the Connecticut Water Company.

In January, 1999, the plaintiffs attended a public information meeting at Waterford town hall that was held in conjunction with the department of environmental protection permitting process. The day after that meet-

---

[9] These other sources are located outside the city and Waterford, and are not subject to the 1988 agreement and its deterrence clause.

ing, the plaintiffs met with Waterford's first selectman, Thomas Sheridan, who informed them of Waterford's desire to purchase the pond. Sheridan told the plaintiffs of Waterford's continued opposition to the development of the pond as an independent water supply. He likewise informed them that they would never be allowed to develop a water business and that "he had the power to put [the] plaintiffs' project 'on hold for two years' with a telephone call to Hartford." Shortly thereafter, in February, 1999, a meeting was held at the department of environmental protection offices in Hartford, attended by department personnel, New London water authority administrator Thomas Bowen, and counsel. Notes from that meeting indicate that Bowen told the department of environmental protection that the city was considering taking the pond by eminent domain.

On February 9, 1999, Bowen wrote on the city's behalf to the Southeast Water Utility Coordinating Committee. He advised the committee of the city's immediate need for water from the pond, as well as the city's and Waterford's interests in purchasing the pond. Bowen mentioned assurances of future supply that the city had made to Montville, as well the defendants' opposition to the existence of another water company, like the plaintiffs' business, in the area.

Several days later, the city and Waterford executed a memorandum of understanding to develop new water sources (memorandum). The memorandum was negotiated through several secret meetings that were held at locations other than regular public facilities, including the dry-cleaning business of the chairman of the New London water authority. This memorandum, drafted in furtherance of the 1988 agreement, states that Waterford "and the [c]ity desire to act in a joint and coordinated manner to pursue the acquisition, development, and management of additional new water supply resources," through either direct purchase or the use

of eminent domain. Early drafts of the memorandum referred specifically to the pond. Subsequent submissions by the city and Waterford to the department of public health continued to refer to the pond as a component of their water systems, but without the plaintiffs' consent. The inclusion of the pond in these supply plans triggers the anticompetitive provision of the Montville agreement, which prevents Montville from doing business with the plaintiffs.

Thereafter, in May, 2000, the plaintiffs met again with the New London water authority to discuss the city's expressed intention to acquire the pond. The city again declined the plaintiffs' offer to conduct business respecting the pond's water, and Bowen again reiterated the city's plan to use the power of eminent domain to take the pond if the plaintiffs did not abandon their water business and sell the pond to the city.

The plaintiffs also state that the city has manipulated market conditions by inflating the available safe yield of water. This market manipulation was done in accordance with the terms of the 1988 agreement that restricted Waterford's ability to seek water source supplies beyond those provided by the city, particularly by conditioning that ability on the city's unilateral declaration of a supply shortage. See footnote 6 of this opinion. Shortly after the execution of the 1988 agreement, the city increased its declared figure for safely available water by 30 percent, from 5.4 million gallons per day to 7 million gallons per day. Both the department of environmental protection and the department of public health have challenged the accuracy of this figure, and an independent department of environmental protection study conducted in April, 1991, calculated that only 5.1 million gallons per day were available as a safe yield. Engineering standards at that time would have justified the declaration of a supply emergency, thus opening up a supply market into which the plaintiffs could have

competed. The department of public health ordered
the city to conduct additional studies, which it did not
commence until 1999 under the terms of a consent
order. In October, 1999, the city reported that 5.7 million
gallons of water per day were available, which was
"perilously close" to the actual usage of 5.6 million
gallons per day. The city did not, however, report this
figure to the state because it could have resulted in a
moratorium on new water connections and created a
market for additional supply. Rather, the city reported
another inflated figure of 6.4 million gallons to the
department of public health, which remains under con-
tinued study.

In August, 2000, the plaintiffs brought this action for
damages and injunctive relief, claiming that the defen-
dants' conduct constituted: (1) restraint of trade in vio-
lation of General Statutes § 35-26;[10] (2) monopolization
in violation of General Statutes § 35-27;[11] (3) "per se"
unlawful acts in violation of General Statutes § 35-28;[12]
and (4) illegal tying arrangements in violation of General
Statutes § 35-29[13] with respect to the 1988 and 1990

[10] General Statutes § 35-26 provides: "Every contract, combination, or con-
spiracy in restraint of any part of trade or commerce is unlawful."

[11] General Statutes § 35-27 provides: "Every contract, combination, or con-
spiracy to monopolize, or attempt to monopolize, or monopolization of any
part of trade or commerce is unlawful."

[12] General Statutes § 35-28 provides: "Without limiting section 35-26, every
contract, combination, or conspiracy is unlawful when the same are for the
purpose, or have the effect, of: (a) Fixing, controlling, or maintaining prices,
rates, quotations, or fees in any part of trade or commerce; (b) fixing,
controlling, maintaining, limiting, or discontinuing the production, manufac-
ture, mining, sale, or supply of any part of trade or commerce; (c) allocating
or dividing customers or markets, either functional or geographical, in any
part of trade or commerce; or (d) refusing to deal, or coercing, persuading,
or inducing third parties to refuse to deal with another person."

[13] General Statutes § 35-29 provides: "Every lease, sale or contract for the
furnishing of services or for the sale of commodities, or for the fixing of
prices charged therefor, or for the giving or selling of a discount or rebate
therefrom, on the condition or understanding that the lessee or purchaser
shall not deal in the services or the commodities of a competitor or competi-
tors of the lessor or seller, shall be unlawful where the effect of such lease

agreements. The defendants subsequently moved for summary judgment.

The trial court, taking as undisputed the facts alleged in the pleadings; see footnote 5 of this opinion; concluded that the defendants were immune from antitrust liability because their activities constituted state action under § 35-31 (b). The trial court relied on this court's decision in *Mazzola* v. *Southern New England Telephone Co.*, 169 Conn. 344, 359, 363 A.2d 170 (1975),[14] which explained § 35-31 (b) as a narrower version of the similar doctrine providing immunity from federal antitrust liability first articulated in *Parker* v. *Brown*, supra, 317 U.S. 350–51. The trial court found the requisite state action in the statutory scheme that required the municipalities to provide a safe water supply, particularly General Statutes § 25-33c.[15] The court concluded that the city opted to be directed by the state statutes

or sale or contract for sale or such condition or understanding may be to substantially lessen competition or tend to create a monopoly in any part of trade or commerce and where such goods or services are for the use, consumption or resale in this state."

Under § 35-29, a "tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (tied) product, or at least agree that he will not purchase that product from any other supplier." *State* v. *Hossan-Maxwell, Inc.*, 181 Conn. 655, 659, 436 A.2d 284 (1980).

[14] The trial court also relied on a pair of state and federal trial court decisions applying § 35-31 (b), both of which were authored by Judge Covello. See generally *Wheelabrator Environmental Systems, Inc.* v. *Galante*, United States District Court, Docket No. 3:97CV01040, 2000 WL 863029 (D. Conn. March 31, 2000); *Professional Ambulance Service, Inc.* v. *Blackstone*, 35 Conn. Sup. 136, 400 A.2d 1031 (1978).

[15] General Statutes § 25-33c provides: "The General Assembly finds that an adequate supply of potable water for domestic, commercial and industrial use is vital to the health and well-being of the people of the state. Readily available water for use in public water systems is limited and should be developed with a minimum of loss and waste. In order to maximize efficient and effective development of the state's public water supply systems and to promote public health, safety and welfare, the Department of Public Health shall administer a procedure to coordinate the planning of public water supply systems."

and regulations when it satisfied the statutory mandate by creating a municipal water system rather than contracting privately for water service. Accordingly, the trial court granted the defendants' motion for summary judgment, and this appeal followed.

On appeal, the plaintiffs claim that the trial court improperly granted the defendants' motion for summary judgment because: (1) a genuine issue of material fact exists as the trial court failed to consider the existence of the relevant wholesale water market and conducted its analysis in the context of the irrelevant, heavily regulated, retail market; and (2) under *Mazzola* v. *Southern New England Telephone Co.*, supra, 169 Conn. 344, the defendants are not entitled to state action immunity under § 35-31 (b) because their conduct was merely approved or acquiesced in by state regulatory agencies, and not "specifically directed or required" by state or federal statutes. The defendants contend otherwise, and they also claim that § 35-44b, as construed in *Vacco* v. *Microsoft Corp.*, 260 Conn. 59, 793 A.2d 1048 (2002), now requires this court to apply the federal case law principles governing state action immunity that have emerged following *Parker*, which provide for immunity if the municipalities' alleged anticompetitive conduct is a " 'foreseeable result' " of state legislation.

Before we turn to the parties' specific claims, we set forth the proper standard of review. We will engage in plenary review of all issues raised in this appeal, particularly because the extent to which anticompetitive conduct is " 'specifically directed or required' by the government is a mixed question of fact and law . . . ." (Citations omitted.) *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 26, 664 A.2d 719 (1995); id., 25–26 (declining to review transit district's § 35-31 [b] state action defense to antitrust action because it was not raised in trial court and record was

insufficient for plain error review); see *Bortner* v. *Woodbridge*, 250 Conn. 241, 258, 736 A.2d 104 (1999) ("mixed question[s] of fact and law [are] subject to plenary review on appeal"); see also, e.g., *Craig* v. *Stafford Construction, Inc.*, 271 Conn. 78, 83, 856 A.2d 372 (2004) (trial court's grant of summary judgment motion); *Barrett* v. *Montesano*, 269 Conn. 787, 792, 849 A.2d 839 (2004) (statutory interpretation).

I

## WHETHER § 35-44b INCORPORATES THE FEDERAL STATE ACTION DOCTRINE OF *PARKER* INTO THE ANTITRUST IMMUNITY PROVIDED BY § 35-31 (b)

We first must determine the correct legal standards to apply to the facts pleaded in the complaint, which entails an examination of the interplay, if any, between federal case law, beginning with *Parker* v. *Brown*, supra, 317 U.S. 341, governing state action immunity, and the statutory state action immunity standard set forth by § 35-31 (b). Indeed, the defendants argue in support of the application of the federal standards that have evolved from the Supreme Court's seminal decision in *Parker*, as an alternate ground for affirming the trial court's judgment.[16] They contend that § 35-44b requires us to construe and apply § 35-31 (b) in accordance with the federal case law following *Parker*, rather than under the more restrictive interpretations given it by Connecticut case law and applied by the trial court.

---

[16] The trial court, in discussing *Parker* v. *Brown*, supra, 317 U.S. 341, stated that it "is interesting to note that this doctrine has evolved through the years; under federal antitrust laws, the defendants' activities would clearly be exempt from liability." Accordingly, it is appropriate for us to consider the defendants' proposed alternate ground for affirmance. See, e.g., *New Haven* v. *Bonner*, 272 Conn. 489, 497, 863 A.2d 680 (2005) (declining to consider alternate ground for affirmance that was not raised before trial court).

The defendants' arguments with respect to § 35-44b present an issue of statutory construction. "It is well settled that in construing statutes, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature." (Internal quotation marks omitted.) *Manifold* v. *Ragaglia*, 272 Conn. 410, 419, 862 A.2d 292 (2004). "[W]e seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Jagger* v. *Mohawk Mountain Ski Area, Inc.*, 269 Conn. 672, 679, 849 A.2d 813 (2004). "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." General Statutes § 1-2z.

Section 35-44b, the statute at issue, provides: "It is the intent of the General Assembly that in construing sections 35-24 to 35-46, inclusive, the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes." We now turn to a review of the two potentially conflicting state and federal legal landscapes.

A

Federal Antitrust Immunity under *Parker*

In 1943, the United States Supreme Court decided *Parker* v. *Brown*, supra, 317 U.S. 341. In *Parker*, a pro-

ducer and packer of raisins had brought an action to enjoin enforcement by the state of California's department of agriculture of a uniform state marketing program that had been promulgated pursuant to state statute. Id., 344–46. The raisin producer claimed that this program violated the federal constitution's Commerce Clause and the Sherman Act, the federal antitrust statute.[17] Id., 348–49. Addressing the Sherman Act claims, the Supreme Court assumed without deciding that the marketing act would violate the antitrust statutes. Id., 350. Noting federalism concerns, however, the court concluded that the marketing program "derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become effective without that command," and that the Sherman Act "gives no hint that it was intended to restrain state action or official action directed by a state." Id., 350–51. The court then limited its holding, stating that a state could not give individuals Sherman Act immunity "by authorizing them to violate it, or by declaring that their action is lawful . . . ." Id., 351–52. (Citations omitted.) Ultimately, the court concluded that "[t]he state in adopting and enforcing the [marketing] program made no contract or agreement and entered into no conspiracy in restraint of trade or to establish monopoly but, as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit." Id., 352.

With respect to the application of state action immunity to municipalities, subsequent decisions of the Supreme Court have held that "*Parker* immunity does not apply directly to local governments . . . have recognized . . . that a municipality's restriction of compe-

---

[17] The Sherman Act provides in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . ." 15 U.S.C. § 1.

tition may sometimes be an authorized implementation of state policy, and have accorded *Parker* immunity where that is the case." (Citations omitted.) *Columbia* v. *Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 370, 111 S. Ct. 1344, 113 L. Ed. 2d 382 (1991). A municipality that desires *Parker* immunity must show that, under the state statutory scheme, it has both " 'authority to regulate' " *and* " 'authority to suppress competition.' " *Electrical Inspectors, Inc.* v. *East Hills*, 320 F.3d 110, 118 (2d Cir. 2002), cert. denied sub nom. *Islandia* v. *Electrical Inspectors, Inc.*, 540 U.S. 982, 124 S. Ct. 467, 157 L. Ed. 2d 373 (2003), quoting *Columbia* v. *Omni Outdoor Advertising, Inc.*, supra, 372. The court's inquiry into the municipality's statutory authority to regulate the field in question has been described as "not . . . exacting" because whether an ordinance is "actually authorized by state statute suggests that as long as the local enactment is within a broad view of the authority granted by the state, whether it is actually violative of that statute is a question for state authorities, not one of federal antitrust law." *Electrical Inspectors, Inc.* v. *East Hills*, supra, 118–19. Moreover, with respect to the municipality's "authority to suppress competition," despite the requirement of a " 'clear articulation of a state policy to authorize anticompetitive conduct,' " the statutory authorization need not be explicit; the requirement is met "if suppression of competition is the 'foreseeable result' of what the statute authorizes." *Columbia* v. *Omni Outdoor Advertising, Inc.*, supra, 372–73, quoting *Hallie* v. *Eau Claire*, 471 U.S. 34, 40–42, 105 S. Ct. 1713, 85 L. Ed. 2d 24 (1985).[18]

---

[18] Indeed, we note that the defendants cite multiple cases wherein municipal water and sewer companies have been held immune from federal antitrust liability under the *Parker* doctrine. See, e.g., *Hallie* v. *Eau Claire*, supra, 471 U.S. 42 (Stating that "it is sufficient that the statutes authorized the [c]ity to provide sewage services and also to determine the areas to be served. We think it is clear that anticompetitive effects logically would result from this broad authority to regulate."); *McCallum* v. *Athens*, 976 F.2d 649, 655 (11th Cir. 1992) (concluding that municipal waterworks is immune from antitrust liability in action brought by retail customers because statutes

## B

### State Action Immunity under § 35-31 (b)

Connecticut has, however, its own statutory version of state action immunity in the form of § 35-31 (b). Section 35-31 (b) provides: "Nothing contained in this chapter shall apply to those activities of any person when said activity is specifically directed or required by a statute of this state, or of the United States." This statute was first explained by this court in *Mazzola* v. *Southern New England Telephone Co.*, supra, 169 Conn. 353–54, wherein the plaintiff brought an action against the telephone company, claiming antitrust violations resulting from the telephone company's practices with respect to answering machines and message-taking devices. Specifically, the plaintiff challenged the requirement that individuals obtaining such services from sources other than the telephone company were required to purchase or lease "protective link apparatus from the [telephone company] at a monthly charge fixed by the [telephone company]." Id., 353. In *Mazzola*, this court addressed the telephone company's argument that § 35-31 (b) rendered it immune from antitrust liability because its activities had been approved by the public utilities commission in accordance with the rate-setting procedure prescribed by General Statutes § 16-19. Id., 357–58.

The court began the decision in *Mazzola* by reviewing the origins of the Connecticut antitrust act, noting that

"unequivocally revealed that [state legislature] contemplated that its municipalities might engage in anticompetitive conduct"); *Kern-Tulare Water District* v. *Bakersfield*, 828 F.2d 514, 519–20 (9th Cir. 1987) (concluding that city's refusal to consent to water district's transfer of surplus water to other utilities was "foreseeable within the [statutory] authority of the city to contract for, acquire and hold water rights, to furnish itself and its inhabitants with water, and to sell, lease, exchange, or transfer surplus water"), cert. denied, 486 U.S. 1015, 108 S. Ct. 1752, 100 L. Ed. 2d 214 (1988).

"[e]nacted in 1971, the act incorporates, in modified form, and with notable exceptions, various provisions of such federal antitrust laws as, for example, the Sherman Act, the Clayton Act, the Antitrust Civil Process Act, and of such state antitrust laws as the provisions embodied in the proposed Uniform State Antitrust Act. . . . Under these circumstances, reference to opinions of courts in other jurisdictions, federal and state, on pertinent antitrust law issues, where appropriate, are an aid to our interpretation of certain questions arising under the present Connecticut statute." (Citations omitted.) Id., 347–48. After first concluding that the Superior Court, rather than the public utilities commission that regulated the telephone company, had primary jurisdiction over the antitrust claims in the case; id., 349–52; the court turned to the telephone company's state action arguments premised on § 35-31 (b). Contrasting § 35-31 (b) with other statutory antitrust exceptions, the court noted that § 35-31 (b) "has no parallel in the federal antitrust statutes," and that "in enacting this provision the Connecticut legislature also did not choose to follow the example set by several other states of specifically and unqualifiedly exempting from antitrust liability the activities of industries and other organizations subject to the supervision of the state regulatory agency equivalent to our public utilities commission." Id., 359. This court stated that "the exception authorized by § 35-31 (b) represents a narrowly drawn version of the doctrine of 'state action' immunity from antitrust liability articulated by the United States Supreme Court in *Parker* v. *Brown*, [supra, 317 U.S. 350–51]. The court in that case carved out an exemption from Sherman Act liability for activities 'commanded' or 'directed' by a state legislature. . . . Section 35-31 (b) limits that holding by purporting to immunize only activities which are 'specifically' required or directed by state or federal statutes." (Citation omitted.) *Mazzola* v. *Southern New*

*England Telephone Co.*, supra, 169 Conn. 359. After reviewing the facts of *Parker*, this court stated that the "*Parker* doctrine draws a firm line, in short, between activities actually commanded by the state, which are immune from antitrust liability and action merely approved or tolerated." Id., 361.

The court then reviewed the public utility rate-setting process of § 16-19, and concluded that "[u]nder these circumstances, the role that is statutorily assigned to the [public utilities commission] in rendering effective tariffs proposed by companies such as the defendant amounts to little more than acquiescence in a program originated by the defendant. In no sense, then, can activities of the defendant such as the kind of activities challenged by the plaintiff, purportedly authorized by a tariff filed with and approved by the [public utilities commission], be characterized as 'compelled by direction of the [s]tate acting as a sovereign' under the *Parker* doctrine as it has been judicially interpreted. . . . *Nor can such activities consequently be comprehended within the more stringent standards applicable to exemptions from antitrust liability established by [§ 35-31 (b)].*" (Citation omitted; emphasis added.) Id., 365–66.

This court next mentioned § 35-31 (b) immunity in the 1995 decision in *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 23–27. Although this court concluded that the issue was not reviewable because it had not been properly raised as a special defense at trial, and the record was not plain error, the court nevertheless briefly discussed in dicta the proper standards for that inquiry. Id., 23–25. The court cited *Mazzola*, acknowledging that it had interpreted § 35-31 (b) as more stringent than the federal law, and stated that under the statute, "[i]n order to be shielded by qualified state action immunity, the defendant must show that its anti-competitive conduct was 'specifically

directed or required' by the government . . . ." (Citation omitted.) Id., 25.

## C

### Whether § 35-44b Requires Incorporation of the Federal Immunity Standards into a § 35-31 (b) Analysis

This court decided *Westport Tax Service, Inc.*, in 1995, three years after the enactment of § 35-44b, which was cited therein in further support of the proposition that, because "[t]he legislative history of the act clearly establishes that it was intentionally patterned after the antitrust law of the federal government. . . . [O]ur construction of the Connecticut Anti-Trust Act is aided by reference to judicial opinions interpreting the federal antitrust statutes. . . . *Accordingly, we follow federal precedent when we interpret the act unless the text of our antitrust statutes, or other pertinent state law, requires us to interpret it differently.*" (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 15–16; see also id., 15 n.17 ("[w]e note that in 1992, the legislature explicitly incorporated into law its intent that the judiciary be guided by interpretations of federal antitrust statutes when it enacted . . . § 35-44b"). The text of § 35-44b provides: "It is the intent of the General Assembly that in construing sections 35-24 to 35-46, inclusive, the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes."

This court explained § 35-44b in detail in *Vacco* v. *Microsoft Corp.*, supra, 260 Conn. 60–61, wherein the plaintiff brought an action under the Connecticut Anti-trust Act against the defendant, Microsoft Corporation. We concluded that the plaintiff, as an end user licensee of the operating system software manufactured by the defendant, could not maintain a state antitrust action

under General Statutes § 35-35[19] because he was not the direct purchaser of the software. Id., 62–64. In so concluding, we noted that § 35-35 was modeled after the relevant section of the federal Clayton Act, 15 U.S.C. § 15,[20] and that the federal courts have interpreted that statute "as precluding an indirect purchaser of goods or services from bringing a private action against the seller who engages in anticompetitive practices in the sale of those goods or services." Id., 66; see also id., 69 (discussing *Illinois Brick Co.* v. *Illinois*, 431 U.S. 720, 97 S. Ct. 2061, 52 L. Ed. 2d 707 [1977], which "held that an indirect purchaser could not bring an antitrust action and offensively use the pass on theory to recover under . . . the Clayton Act"). We then relied on the legislative history of the Antitrust Act, and specifically the history and text of § 35-44b, which "make explicit [the legislature's] intent that the judiciary shall interpret the Antitrust Act in accordance with the federal courts' interpretation of federal antitrust law." *Vacco* v. *Microsoft Corp.*, supra, 72–73. We rejected the plaintiff's claim that the adoption of the indirect purchaser rule would render superfluous the text of § 35-35, because that statute, unlike the parallel provision of the federal Clayton Act, explicitly provides "consumers" with a right of action under the Antitrust Act. Id., 74–76. We noted that the federal precedent with respect to indirect pur-

[19] General Statutes § 35-35 provides: "The state, or any person, including, but not limited to, a consumer, injured in its business or property by any violation of the provisions of this chapter shall recover treble damages, together with a reasonable attorney's fee and costs."

[20] The relevant provision of the Clayton Act, 15 U.S.C. § 15, provides in relevant part: "(a) Amount of recovery; prejudgment interest

"Except as provided in subsection (b) of this section, any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. . . ."

chasers remained persuasive as applied to the plaintiff in *Vacco* because of other well established federal case law allowing consumers to bring claims under the Clayton Act. Id., 76, citing *Reiter* v. *Sonotone Corp.*, 442 U.S. 330, 338–42, 99 S. Ct. 2326, 60 L. Ed. 2d 931 (1979). We then concluded that "allowing only those consumers who purchase directly from the antitrust defendant to bring suit under our state antitrust law ensures that the Antitrust Act remains harmonious with federal antitrust statutes."[21] *Vacco* v. *Microsoft Corp.*, supra, 76–77.

We conclude that § 35-44b does not require us to incorporate the federal case law defining state action immunity into our construction of § 35-31 (b). The applicability of § 35-44b to the facts and legal landscape of the present case is questionable, at best. First and foremost, state action immunity under the Connecticut Antitrust Act is based on a standard set forth in a specific statutory provision, namely, § 35-31 (b), while that same immunity under federal law has its origins in case law construing the more generalized provision of the Sherman Act, 15 U.S.C. § 1. See, e.g., *Parker* v. *Brown*, supra, 317 U.S. 348–49; *Electrical Inspectors, Inc.* v. *East Hills*, supra, 320 F.3d 118; see footnote 17 of this opinion for the text of the Sherman Act. Indeed, we have recognized that § 35-31 (b) "has no parallel in the federal antitrust statutes."[22] *Mazzola* v. *Southern New*

---

[21] In so concluding, we also noted the extensive legislative history behind the failure of numerous "*Illinois Brick* [*Co.*] repealer bills," which attempted to nullify at the state level the United States Supreme Court holding in *Illinois Brick Co.* v. *Illinois*, supra, 431 U.S. 735; *Vacco* v. *Microsoft Corp.*, supra, 260 Conn. 77–82, 77 n.22; as well as the "the inferential value of failed attempts to amend existing laws with respect to the intent of the legislature to acquiesce in prevailing judicial interpretations of such laws." (Internal quotation marks omitted.) Id., 79.

[22] Discussed at oral argument before this court, another example of a federal-state antitrust distinction is Congress' express prohibition on the recovery of damages from a municipality under the Clayton Act, an enactment that has no parallel in the state statutory scheme. See 15 U.S.C. § 35 (a) ("[n]o damages, interest on damages, costs, or attorney's fees may be recovered under section 4, 4A, or 4C of the Clayton Act [15 U.S.C. §§ 15,

*England Telephone Co.*, supra, 169 Conn. 359. It is well settled that "[w]here statutes contain specific and general references covering the same subject matter, the specific references prevail over the general." *Galvin* v. *Freedom of Information Commission*, 201 Conn. 448, 456, 518 A.2d 64 (1986). Moreover, although there is legislative history supporting the defendants' argument that § 35-44b was intended to "create one, national body of law,"[23] neither that history nor the language of the statute as enacted requires: (1) the repeal of antitrust statutes unique to our state, without a parallel provision in the federal scheme; or (2) the overruling of state case law interpreting those statutes that are specific to Connecticut.[24] Accordingly, we must conclude that § 35-

---

15a, or 15c] from any local government, or official or employee thereof acting in an official capacity").

[23] We note that the legislative history of § 35-44b indicates that the legislature's purpose in enacting that statute was to "mirror what Connecticut has done with unfair trade practices. Under the Connecticut Unfair Trade Practices Act . . . Connecticut looks to Federal Unfair Trade Practices Act, jurisprudence. [Section 35-44b] would attempt to do the same thing with antitrust law. The goal being to have a single antitrust jurisprudence in the United States. This is vital if corporations are going to be able to make critical decisions about research and development projects, that they may undertake.

"[This is like] corporate ventures in general, where antitrust laws may pose an obstacle. This would allow them to look to a single case law jurisprudence, in order to know whether they're in compliance with our laws or not. Currently, a corporation in Connecticut or elsewhere, may have to look to [fifty] different sets of jurisprudence. This would move towards a national jurisprudence, and I believe it will strongly enhance the international competitiveness of Connecticut, and of American manufacturing and research companies, wherever they may be." 35 H.R. Proc., Pt. 7, 1992 Sess., pp. 2386–87, remarks of Representative Thomas Moukawsher; see also Conn. Joint Standing Committee Hearings, Commerce and Exportation, Pt. 2, 1992 Sess., p. 735, testimony of Joseph Brennan, vice president of legislative affairs for Connecticut Business and Industry Association ("The Connecticut Antitrust Act, however, is inconsistent in its language and its application to federal antitrust law. The possibility of multiple enforcement by agencies applying different standards can create serious problems for businesses engaged in interstate commerce.").

[24] A brief review of the legislation and case law of other states demonstrates that had the legislature desired the wholesale incorporation of federal

44b merely gave legislative imprimatur to what this court had been doing long before its enactment, namely, looking to case law construing relevant federal statutes as persuasive authority. See, e.g., *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 15, quoting *State* v. *Hossan-Maxwell, Inc.*, 181 Conn. 655, 660, 436 A.2d 284 (1980) ("[o]ur construction of the Connecticut Antitrust Act is aided by reference to judicial opinions interpreting the federal antitrust statutes" [internal quotation marks omitted]); see *Elida, Inc.* v. *Harmor Realty Corp.*, 177 Conn. 218, 226–27, 413 A.2d 1226 (1979); *Mazzola* v. *Southern New England Telephone Co.*, supra, 348. Indeed, in *Westport Taxi Service, Inc.*, a case decided after the enactment of § 35-44b, and citing that statute, this court emphasized that "we follow federal precedent when we interpret the act unless the text of our antitrust statutes, or other pertinent state law, requires us to interpret it differently." *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 15–16; see also id., 39–45 (concluding that interpretation of text of Connecticut Antitrust Act as precluding awards of prejudgment interest is consis-

---

law into the state scheme, it could have done so. See *Duck Tours Seafari, Inc.* v. *Key West*, 875 So. 2d 650, 653 (Fla. App.) ("Under Florida law, '[a]ny activity or conduct . . . exempt from the provisions of the antitrust laws of the United States is exempt from the provisions of this chapter [542].' § 542.20, Fla. Stat. (1995). Thus, the doctrine of state action immunity which has developed under federal antitrust law is also an available defense to a suit against a municipality for a violation of Florida's antitrust laws."), review denied, 890 So. 2d 1114 (2004); see also *Dill* v. *Board of County Commissioners*, 928 P.2d 809, 815–16 (Colo. App. 1996) ("any person exempt or immune under federal antitrust law is exempt from the Colorado Antitrust Act of 1992"). Moreover, statutes such as § 35-44b do not necessarily counsel blind adherence to all things federal. See *Fine Airport Parking, Inc.* v. *Tulsa*, 71 P.3d 5, 10–11 (Okla. 2003) (acknowledging statute requiring state antitrust law to "be interpreted and applied consistent with federal antitrust law," but stating that "[t]he principles of federalism supporting the *Parker* doctrine are meaningless in an analysis of municipal liability under [state antitrust statutes]" because "the state is the sovereign and the municipality is a political subdivision of the state").

tent with relevant federal precedent). Accordingly, § 35-44b simply is inapplicable in the present case, which concerns a state antitrust statute without federal parallel.[25]

[25] The concurring opinion concludes that "[b]ecause § 35-31 (b) is more specific than § 35-44b, its terms should prevail in this case. Thus, there is no need to go beyond the plain and unambiguous language of the statute." The concurrence further states that it "see[s] no need" for much of the analysis herein, including our "lengthy" explanation of how federal antitrust state action immunity relates to Connecticut's antitrust state action immunity. We take this opportunity to express briefly our respectful disagreement with much of the concurrence's analysis.

We first note that the concurring opinion, while professing to follow strictly § 1-2z, in fact departs from the analysis directed by that statute by invoking the canon of statutory construction that provides, "[w]here statutes contain specific and general references covering the same subject matter, the specific references prevail over the general." *Galvin* v. *Freedom of Information Commission*, supra, 201 Conn. 456. If the statutes at issue were in fact as plain and unambiguous as the concurrence states, resort to this canon, which is itself a form of "extratextual evidence of the meaning of the statute"; General Statutes § 1-2z; simply would be unnecessary. Moreover, while canons certainly do have their place in the construction of statutes, it strikes us as unwise to elevate them over all other forms of "extratextual evidence" because, for almost every maxim found in the "grab bag" of canons, an equal and opposite proposition may be found. We have stated: "Although the so-called canons of statutory construction may at times serve as useful tools in deciphering legislative meaning, to rely on any one of them as a compelling factor in the interpretive process is problematic, because as Professor Karl Llewellyn persuasively has demonstrated, 'there are two opposing canons on almost every point.' K. Llewellyn, 'Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are to Be Construed,' 3 Vand. L. Rev. 395, 401 (1950). The so-called 'canons' are not that, at least in the sense that any one of them reliably can be determined to apply or not to apply in any given case. They are, instead, merely guides drawn from experience, to be employed or not to be employed carefully and judiciously, depending on the circumstances. See F. Frankfurter, 'Some Reflections on the Reading of Statutes,' 47 Colum. L. Rev. 527, 544–45 (1947); see also *United Illuminating Co.* v. *New Haven*, 240 Conn. 422, 455, 692 A.2d 742 (1997). 'To permit them to displace the conclusions that careful interpretation yields . . . would be a disservice to the legislative process, as well as to the judicial exercise of interpreting legislative language based upon the premise that the legislature intends to enact reasonable public policies.' *United Illuminating Co.* v. *New Haven*, supra, 455." *Burke* v. *Fleet National Bank*, 252 Conn. 1, 23–24, 742 A.2d 293 (1999).

We also disagree with the analysis contained in footnote 3 of the concurring opinion, namely, that "[f]ederal antitrust law pertaining to state action immunity is more lenient than § 35-31 (b), but is just as specific. The reason

Moreover, the "[t]he General Assembly is always presumed to know all the existing statutes and the effect that its action or non-action will have upon any one of them"; (internal quotation marks omitted) *Hatt* v. *Burlington Coat Factory*, 263 Conn. 279, 310, 819 A.2d 260 (2003); as well as "the interpretation which the courts have placed upon one of its legislative enactments and of the effect that its own nonaction, thereafter may have." (Internal quotation marks omitted.) *State* v. *Ramos*, 271 Conn. 785, 797, 860 A.2d 249 (2004); id. ("[t]he legislature's failure to act upon our interpretation of [General Statutes] § 29-38 in *State* v. *Scully*, [195 Conn. 668, 678, 490 A.2d 984 (1985)], suggests that the legislature agrees with it"). Accordingly, we will not torture the language of § 35-44b to reach the results, disfavored in our jurisprudence, of overruling past decisions construing § 35-31 (b), or impliedly repealing that same statute.[26] See, e.g., *Waterbury* v. *Washington*, 260 Conn. 506, 538, 800 A.2d 1102 (2002) ("[T]he doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it. . . . In assessing the force

that we should not follow federal law in this case is that the provisions of § 35-31 (b) are more specific than the provisions of § 35-44b and, therefore, to the extent that there is a patent inconsistency between the plain language of § 35-31 (b) and the federal law, the provisions of § 35-44b requiring us to follow federal law do not apply." We do not perceive the resolution of this case as turning on whether § 35-31 (b) is more specific than § 35-44b, because the statutes fundamentally are different. Section 35-31 (b) is a substantive rule of law pertaining directly to the parties' conduct while, in contrast, § 35-44b evinces the legislature's intent with respect to the interpretation of substantive antitrust statutes like § 35-31 (b). The concurrence's analysis misstates the central issue herein, which is the applicability of § 35-44b, and to resolve that question, we necessarily must compare § 35-31 (b) and 15 U.S.C. § 1, to ascertain the relevant similarities and differences between the state and federal enactments.

[26] We also note that adoption of the federal standard would diminish the strict construction that we give to the exceptions under § 35-31, including § 35-31 (b). *Cheryl Terry Enterprises, Ltd.* v. *Hartford*, 270 Conn. 619, 628, 854 A.2d 1066 (2004), citing *Mazzola* v. *Southern New England Telephone Co.*, supra, 169 Conn. 355.

of stare decisis, our case law has emphasized that we should be especially cautious about overturning a case that concerns statutory construction." [Citation omitted; internal quotation marks omitted.]); *Nash* v. *Yap*, 247 Conn. 638, 648, 726 A.2d 92 (1999) ("implied repeal of a statute is not favored and will not be presumed where, as here, the old and new statutes can coexist peaceably"). We, therefore, reaffirm the continuing vitality of *Mazzola* v. *Southern New England Telephone Co.*, supra, 169 Conn. 365–66, as the controlling interpretation of a state antitrust statute without a federal parallel, and we decline to consider the evolved state action doctrine of *Parker* v. *Brown*, supra, 317 U.S. 341, as either mandatory or persuasive in the construction and application of § 35-31 (b).

II

## WHETHER THE TRIAL COURT PROPERLY CONCLUDED THAT THE STATUTORY SCHEME "SPECIFICALLY DIRECTED OR REQUIRED" THE DEFENDANTS' ACTIVITIES

Having concluded that § 35-31 (b), as explained by *Mazzola* v. *Southern New England Telephone Co.*, supra, 169 Conn. 361, provides the governing standard to apply in the present case, we now consider whether the trial court applied it properly to the facts pleaded by the plaintiffs when viewed in light of the statutes and regulations governing the activities of municipal water companies. The plaintiffs claim that the defendants are not entitled to immunity under § 35-31 (b) because their conduct with respect to the wholesale water market was not "specifically directed or required" as: (1) they voluntarily subjected themselves to the comprehensive statutory and regulatory scheme governing water companies; (2) regulatory approval or acceptance of water supply contracts and plans by state agencies

that are not charged with antitrust enforcement does not constitute the required specific statutory command or direction; and (3) the statutory mandate of a "safe and adequate supply of water" under § 25-33c does not satisfy the specificity requirement of § 35-31 (b). The defendants, citing the plethora of statutes and regulations, including § 25-33c, that govern the activities of water companies, contend in response that their allegedly anticompetitive actions were required by the "totality of [that] mandate . . . ." We agree with the plaintiffs.

## A

### Definition of the Relevant Market

We note at the outset that proper analysis in an antitrust case first requires determination of the "relevant market . . . ." *AD/SAT* v. *Associated Press*, 181 F.3d 216, 225 (2d Cir. 1999); id. ("[a]s is frequently the case in antitrust litigation, the [c]ourt's definition of the relevant market was dispositive"); accord *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 16 ("[m]onopoly power is power to fix or control prices or to exclude or control competition in the relevant market" [internal quotation marks omitted]). "The relevant market for purposes of antitrust litigation is the 'area of effective competition' within which the defendant operates." *AD/SAT* v. *Associated Press*, supra, 227. Market definition generally "is a deeply fact-intensive inquiry . . . ." *Todd* v. *Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001); see also *Hayden Publishing Co.* v. *Cox Broadcasting Corp.*, 730 F.2d 64, 70 (2d Cir. 1984) ("[i]n our view, there were clearly genuine issues of fact concerning the definition of the relevant market, thus precluding even partial summary judgment").

The plaintiffs contend, both in their brief and at oral argument before this court, that the trial court improperly conducted its state action analysis in a manner that

implicitly accepted the defendants' argument that, as a factual proposition, the relevant wholesale water market does not exist. The plaintiffs argue that, at the very least, a genuine issue of material fact with respect to the relevant market exists, thereby precluding summary judgment. Our review of the trial court's memorandum of decision shows that the court acknowledged the plaintiffs' claim with respect to the relevant market, but neither ruled on the existence of a distinction between the retail and wholesale markets, nor explained how any such distinction affected its analysis.

Having reviewed the pleadings and factual record in this case in the context of the relevant statutes, we conclude that there is, at the very least, a genuine issue of material fact as to the existence of a wholesale water market in southeastern Connecticut.[27] The plaintiffs have pleaded their intention to sell water from the pond to other water utilities, including the defendants, in the New London area for subsequent distribution. Moreover, the difference between the wholesale and retail markets was explained by Schacht in an affidavit submitted to the trial court in connection with the defendants' motion for summary judgment. In that affidavit, Schacht stated that retail customers are individuals or

[27] We note that further explication on this point by the trial court would have greatly aided our review of the market definition issue, and that the better practice would have been for the plaintiffs, who as the appellants bear responsibility for providing an adequate record for review, to move for an articulation pursuant to Practice Book § 66-5. Nevertheless, the plaintiffs' claim remains reviewable because: (1) the underlying facts are undisputed in light of the trial court's decision to treat the defendants' summary judgment motion as one of judgment on the pleadings; see footnote 5 of this opinion; (2) whether the trial court properly granted a motion for summary judgment is a question of law subject to de novo review; and (3) the relevant documents are part of the record on appeal. See *Ammirata* v. *Zoning Board of Appeals*, 264 Conn. 737, 744–45, 745 n.10, 826 A.2d 170 (2003) (res judicata and collateral estoppel claims); *Niehaus* v. *Cowles Business Media, Inc.*, 263 Conn. 178, 185, 819 A.2d 765 (2003) (whether agreement was clear and unambiguous).

businesses that purchase water from individual utility companies through "service connections" to water mains. Wholesale water customers, by contrast, are utility companies themselves, which purchase water in bulk for resale to retail customers. Schacht noted that the retail relationships are compulsory and not subject to competitive market factors because the department of public health designates exclusive service areas, wherein one utility is assigned responsibility for providing retail water service. See also General Statutes § 25-33d (c) (defining " '[e]xclusive service area' " as "an area where public water is supplied by one system"). Schacht averred that, in contrast, the wholesale market is voluntary and independent of the exclusive service area system. Accordingly, viewing the relevant market in the light most favorable to the plaintiffs; see, e.g., *Zhang* v. *Omnipoint Communications Enterprises, Inc.*, 272 Conn. 627, 633, 866 A.2d 588 (2005); we conclude that our analysis of the relevant statutes and regulations must take place in the context of the wholesale water market.[28]

B

### The Statutory Scheme Relevant to the Defendants' Activities

Municipalities and other entities in the water business, especially at the retail level, unquestionably are subject to a vast array of statutes and regulations. Nevertheless, the "mere pervasiveness of a regulatory scheme does not immunize an industry from antitrust liability for conduct that is voluntarily initiated." *MCI Communications Corp.* v. *American Telephone & Tele-*

---

[28] We note that the applicable department of public health regulations also contemplate a wholesale market, as the definition of " '[a]vailable water' " includes water supplied by contract, as well as that obtained through "active sources . . . ." Regs., Conn. State Agencies § 25-32d-1a (4). To be "available," however, the contract must not be "subject to cancellation or suspension . . . ." Id.

*graph Co.*, 708 F.2d 1081, 1103 (7th Cir.), cert. denied, 464 U.S. 891, 104 S. Ct. 234, 78 L. Ed. 2d 226 (1983); id. ("[a]lthough the [Federal Communications Commission] has authority to compel interconnection under [47 U.S.C. §] 201(a) of the [Federal Communications] Act, the initial decision whether to interconnect rests with the utility, and the record shows that the [Federal Communications Commission] did not control or approve of [the defendant's] actions here"). Accordingly, we must review the bevy of statutes and regulations produced by the defendants in search of the specific direction or requirement that they argue exists.[29]

Regulation of water companies begins at their inception. Water companies may not be formed without a special act of the General Assembly after investigation and a report by the department of environmental protection, the department of public health and the department of public utility control into, inter alia, the proposed company's financial solvency, its water supply system adequacy and potability, and "the effect on water supplies of other systems . . . ." General Statutes § 2-20a; see also General Statutes § 7-234 (municipalities "may acquire, construct and operate a municipal water supply system where [1] there is no existing private waterworks system, [2] the owner or owners of a private waterworks system are willing to sell or transfer all or part of such system to the municipality, or [3] a public regional waterworks system within said town, city or borough or district is willing to sell or transfer all or part of the system to the municipality").[30]

---

[29] We have reviewed the myriad of statutes and regulations cited by the defendants in the synopsis contained in their appendix, as well as those actually discussed in their brief. We do not, however, discuss *all* of them in this opinion because many are, despite their pervasive verbosity, nevertheless tangential or irrelevant to the issues discussed herein.

[30] We note that both the plaintiffs and the defendants engage in extensive discussions of the special act through which the General Assembly established the Southeastern Connecticut Water Authority in 1967. See Special

The extensive regulatory scheme is in furtherance of the legislative finding and general statement of policy articulated in § 25-33c, which was mentioned by the trial court,[31] and provides: "The General Assembly finds that an *adequate supply* of potable water for domestic, commercial and industrial use is vital to the health and well-being of the people of the state. Readily available water for use in public water systems is limited and should be developed with a minimum of loss and waste. In order to maximize efficient and effective development of the state's public water supply systems and to promote public health, safety and welfare, *the Department of Public Health shall administer a procedure to coordinate the planning of public water supply systems.*"[32] (Emphasis added.) General Statutes § 25-33c.

Acts 1967, No. 381. The plaintiffs rely on language in the special act that expressly mentions the authority of the Southeastern Connecticut Water Authority to obtain and sell water at wholesale to water utilities. See Special Acts 1967, No. 381, § 14 (h). The defendants, in contrast, rely on the Southeastern Connecticut Water Authority's eminent domain power, which it received despite concerns of investor-owned water utilities that were expressed in committee hearings. See Special Acts 1967, No. 381, § 14 (c). We conclude that, although this special act supports the plaintiffs' contentions with respect to the distinction between wholesale and retail water markets; see part II A of this opinion; it is otherwise tangential to the present case because it does not provide water companies or municipalities with any relevant powers.

[31] We note that the trial court's decision in the present case cited and quoted only § 25-33c in discussing the statutory and regulatory scheme, but acknowledged that the defendants provided it with a comprehensive synopsis of the entire scheme.

[32] Accordingly, the legislature also gives the department of public health jurisdiction over "all matters concerning the purity and adequacy of any water supply source used by any municipality, public institution or water company for obtaining water, the safety of any distributing plant and system for public health purposes, the adequacy of methods used to assure water purity, and such other matters relating to the construction and operation of such distributing plant and system as may affect public health." General Statutes § 25-32 (a).

By way of illustration, the defendants cite several examples of the department of public health's extensive jurisdiction over water companies and their properties, such as the requirement of a written permit for the transfer, lease, assignment or change in the use of watershed lands. See General

Indeed, the regulatory scheme envisioned by the legislature is not toothless, as General Statutes § 25-32e gives the department of public health the authority to impose civil penalties upon water companies for violations of the water supply statutes and regulations promulgated thereto, as well as "any regulation in the Public Health Code relating to the purity and adequacy of water supplies or to the testing of water supplies or any report of such testing . . . ." General Statutes § 25-32e (a).

The defendants point out correctly that the statutes and regulations do envision a significant degree of cooperation, and indeed, regional coordination of water companies. For example, water utility coordinating committees are required to "prepare a coordinated water system plan in the public water supply management area" that "shall promote cooperation among public water systems," and to submit that plan to the department of public health. General Statutes § 25-33h (a).[33] Indeed, part of this cooperation is avoiding dupli-

Statutes § 25-32 (b), (c), (d) and (e). Moreover, a water company may not agree to sell water reserves in excess of what it needs to provide adequate services without a permit to do so from the department of public health. General Statutes § 22a-358. Similarly, a water company may not abandon a water supply source without approval of the department of public health, which shall not be granted if that source would be necessary in an emergency or "the proposed abandonment would impair the ability of such company to provide a pure, adequate and reliable water supply for present and projected future customers," for fifty years from the date of application. General Statutes § 25-33k (c) (2).

Indeed, a water company desiring to sell even a potential or abandoned source of water must notify the department of public health, which shall order that company to notify "other water companies that may reasonably be expected to utilize the source, potential source or abandoned source of its intention and the price at which it intends to sell such source. . . ." General Statutes § 25-33l (a). That statute also prescribes a procedure for other water companies to buy that source, and empowers the department of public health to determine who may buy the source if it is desired by multiple water companies. General Statutes § 25-33l (b).

[33] General Statutes § 25-33h (a) provides: "Each water utility coordinating committee shall prepare a coordinated water system plan in the public water supply management area. Such plan shall be submitted to the Commissioner of Public Health for his approval not more than two years after the first

cation of service, as directed by General Statutes § 16-262m, which prescribes requirements that must be met before a water company constructs a new water supply system or expands an existing one. To obtain the requisite "certificate of public convenience and necessity for [such] construction or expansion" from the department of public utility control and the department of public health, the departments first must determine that "(1) *no feasible interconnection with an existing system is available to the applicant,* (2) the applicant will complete the construction or expansion in accordance with engineering standards established by regulation by the Department of Public Utility Control for water supply systems, (3) the applicant has the financial, managerial and technical resources to operate the proposed water supply system in a reliable and efficient manner and to provide continuous adequate service to consumers served by the system, (4) the *proposed construction or expansion will not result in a duplication of water service in the applicable service area* and (5) the applicant meets all federal and state standards for water supply systems . . . ." (Emphasis added.) General Statutes § 16-262m (b).

The statutes also envision extensive planning in conjunction with that coordination. Under General Statutes § 25-32d (a),[34] water companies are required to submit

meeting of the committee. The plan shall promote cooperation among public water systems and include, but not be limited to, provisions for (1) integration of public water systems, consistent with the protection and enhancement of public health and well-being; (2) integration of water company plans; (3) exclusive service areas; (4) joint management or ownership of services; (5) satellite management services; (6) interconnections between public water systems; (7) integration of land use and water system plans; (8) minimum design standards; (9) water conservation; (10) the impact on other uses of water resources; and (11) acquisition of land surrounding wells proposed to be located in stratified drifts."

[34] General Statutes § 25-32d (e) directs notice and the content thereof to municipalities when water companies submit a plan or revised plan that "involves a forecast of land sales, abandonment of any water supply source, sale of any lands, or land reclassification . . . ."

a water supply plan to the department of public health for approval "with the concurrence of the Commissioner of Environmental Protection."[35] A water supply plan is required to "evaluate the water supply needs in the service area of the water company submitting the plan and propose a strategy to meet such needs." General Statutes § 25-32d (b). The plan must "include: (1) A description of existing water supply systems; (2) an analysis of future water supply demands; (3) an assessment of alternative water supply sources which may include sources receiving sewage and sources located on state land; (4) contingency procedures for public drinking water supply emergencies, including emergencies concerning the contamination of water, the failure of a water supply system or the shortage of water; (5) a recommendation for new water system development; (6) a forecast of any future land sales, an identification which includes the acreage and location of any land proposed to be sold, sources of public water supply to be abandoned and any land owned by the company which it has designated, or plans to designate, as class III land; (7) provisions for strategic groundwater monitoring; (8) an analysis of the impact of water conservation practices and a strategy for implementing supply and demand management measures; and (9) on and after January 1, 2004, an evaluation of source water protection measures for all sources of the water supply, based on the identification of critical lands to be protected and incompatible land use activities with the

[35] General Statutes § 25-32d (d) requires the department of public health to adopt implementing regulations, "in consultation with" the department of environmental protection and the public utilities control authority, and that "[s]uch regulations shall include a method for calculating safe yield, the contents of emergency contingency plans and water conservation plans, the contents of an evaluation of source water protection measures, a process for approval, modification or rejection of plans submitted pursuant to this section, a schedule for submission of the plans and a mechanism for determining the completeness of the plan. . . ."

potential to contaminate a public drinking water source."[36] General Statutes § 25-32d (b).

Similar planning occurs on the level of the water utility coordinating committees, who are required to conduct preliminary assessments, in consultation with the department of environmental protection and the department of public health, of water supply conditions and problems in their areas. See General Statutes § 25-33g (a). As part of this process, the water utility coordinating committees "shall establish preliminary exclusive service area boundaries, based on the final assessment, for each public water system within the management area, and may change such boundaries. . . . If there is no agreement by the committee on such boundaries, or on a change to such boundaries, the committee shall consult with the Department of Public Utility Control. If there is no agreement by the committee after such consultation, the Commissioner of Public Health shall establish or may change such exclusive service area boundaries taking into consideration any

---

[36] Agency regulations implementing § 25-32d prescribe a process for the submission, completion and approval of the plan. Section 25-32d-5 (c) (1) of the Regulations of Connecticut State Agencies provides a timeline for the process by which the department of public health consults with the department of environmental protection and the department of public utility control. Section 25-32d-5 (c) (3) of the Regulations of Connecticut State Agencies requires the commissioner to approve, reject, or approve the plan "with conditions" within sixty days of department of environmental protection or department of public utility control comment, or if there has been no such comment, "in no case more than one hundred and fifty days after written notice that the plan has been deemed complete . . . ."

Section 25-32d-5 (c) (2) of the Regulations of Connecticut State Agencies provides factors for the department of public health to consider "in making a decision to approve, modify or reject a plan," including "(A) the ability of the company to provide a pure, adequate and reliable water supply for present and projected future customers;

"(B) adequate provision for the protection of the quality of future and existing sources;

"(C) comments from state agencies; and

"(D) consistency with state regulations and statutes."

water company rights established by statute, special act or administrative decisions. In establishing such boundaries the commissioner shall maintain existing service areas and consider the orderly and efficient development of public water supplies. In considering any change to exclusive service area boundaries, the commissioner shall maintain existing service areas, consider established exclusive service areas, and consider the orderly and efficient development of public water supplies." General Statutes § 25-33g (b).

Indeed, "[e]ach water utility coordinating committee shall prepare a coordinated water system plan in the public water supply management area. Such plan shall be submitted to the Commissioner of Public Health for his approval not more than two years after the first meeting of the committee. The plan shall promote cooperation among public water systems and include, but not be limited to, provisions for (1) integration of public water systems, consistent with the protection and enhancement of public health and well-being; (2) integration of water company plans; (3) exclusive service areas; (4) joint management or ownership of services; (5) satellite management services; (6) interconnections between public water systems; (7) integration of land use and water system plans; (8) minimum design standards; (9) water conservation; (10) the impact on other uses of water resources; and (11) acquisition of land surrounding wells proposed to be located in stratified drifts."[37] General Statutes § 25-33h (a).

---

[37] General Statutes § 25-33h (b) prescribes a procedure for the adoption of the plan, and requires that the committee seek comments from, inter alia, the department of public health, on "the availability of pure and adequate water supplies, potential conflicts over the use of such supplies, and consistency with the goals of sections 25-33c to 25-33j, inclusive."

Section 25-33h-1 (d) of the Regulations of Connecticut State Agencies prescribes the contents of the coordinated water supply plans promulgated pursuant to General Statutes § 25-33h. It requires that "[t]he coordinated water system plan shall include, but not be limited to, the following:

"(1) The individual water system plan of each public water system within a public water supply management area, required to file such plan pursuant to section 25-32d of the Connecticut General Statutes; and

Moreover, the department of public health permits may only be issued in accordance with the coordinated plans adopted pursuant to § 25-33h; see General Statutes § 25-33i (a); "[n]o public water supply system may be approved within a public water supply management area after the Commissioner of Public Health has convened a water utility coordinating committee unless (1) an existing public water supply system is unable to provide water service or (2) the committee recommends such approval." General Statutes § 25-33i (b).

C

Application of § 35-31 (b) to the Water Company and Supply Statutes

The defendants argue that these statutes and regulations "seek to promote the cooperation and intercon-

---

"(2) An areawide supplement that shall address areawide water system concerns pertaining to the public water supply management area which are not otherwise included in each water company's individual water system plan. The areawide supplement consists of a water supply assessment, exclusive service area boundaries, integrated report, and executive summary. The areawide supplement shall include at least the following:

"(A) Water Supply Assessment

"A water supply assessment shall be developed to evaluate water supply conditions and problems within the public water supply management area. The [water utility coordinating committee] shall prepare a preliminary and then a final water supply assessment. The water supply assessment shall be a factual and concise report including at least the following topics as they relate to public water systems in the public water supply management area:

"(i) Description of existing water systems, including

"(aa) History of water quality, reliability, service, and supply adequacy;

"(bb) General fire fighting capability of the utilities; and

"(cc) Identification of major facilities which need to be expanded, altered, or replaced.

"(ii) Availability and adequacy of any future water source(s).

"(iii) Existing service area boundaries and public water system limits established by statute, special act or administrative decision, including a map of established boundaries, and identification of systems without boundaries.

"(iv) Present and projected growth rates, including population data, land use patterns and trends, and identification of lands available for development.

"(v) Status of water system planning, land use planning and coordination between public water systems. . . ." Regs., Conn. State Agencies § 25-33h-1 (d).

nection of water companies, and, by contrast, do not seek to promote the creation of new, independent owners of water sources." They claim that "it is simply inaccurate to state as do the plaintiffs that there exists in Connecticut a wholly unregulated wholesale market for water. The comprehensive scheme of regulation in place in Connecticut regulates all activities of Connecticut water companies and it is at the very least reasonably foreseeable that 'virtual monopolies' might result in some areas with regard to the purchase and sale of bulk water. The creation of exclusive service areas requires and entails marshalling, allocation, and protection of water sources, including interconnection, hence [it] regulates all aspects of the defendants' operations."

We note, at the outset, that we need not determine whether a monopoly is the "reasonably foreseeable" result of this statutory scheme. That inquiry would have its basis in the broader state action standards found under federal case law following *Parker*, and is, therefore, incompatible with the narrower analysis demanded by § 35-31 (b). See part I A of this opinion. As discussed previously in part I C of this opinion, this court's decision in *Mazzola* v. *Southern New England Telephone Co.*, supra, 169 Conn. 344, remains the controlling construction of § 35-31 (b). Case law following *Mazzola* that applied § 35-31 (b) demonstrates that the Connecticut immunity statute, which requires that the challenged activities be "specifically directed or required by a statute," demands a more exacting analysis. Put differently, the cases demonstrate that § 35-31 (b) immunity from antitrust liability will attach only if the statute under which protection is sought speaks directly to the challenged conduct. Generalized statements of policy or implications from the sheer pervasiveness of a regulatory scheme as a whole, therefore, simply do not have the requisite specificity under § 35-

31 (b).[38] Indeed, this is consistent with the ordinary meaning of the word "specific" used in the statute. The American Heritage College Dictionary (4th Ed. 2002) defines "specific" in relevant part as: "1. Explicitly set forth; definite. . . . 4a. Intended for, applying to, or acting on a particular thing . . . ." Accordingly, we emphasize that mere approval or acquiescence by a regulatory agency will not cloak an entity with antitrust immunity pursuant to § 35-31 (b). See *Mazzola* v. *Southern New England Telephone Co.*, supra, 357–58.

Apart from this court's leading decision in *Mazzola*, the case law applying § 35-31 (b) is entirely contained in state and federal trial court decisions.[39] In *Mazzola* v. *Southern New England Telephone Co.*, supra, 169 Conn. 353, which was discussed in part I B of this opinion, the plaintiff brought an action against the telephone company, claiming antitrust violations resulting from the company's practices with respect to answering machines and message-taking devices, specifically the requirement that individuals obtaining such services from sources other than the telephone company were required to purchase or lease linking apparatus from the company. This court concluded that the telephone company was not immune from antitrust liability under § 35-31 (b), rejecting its argument that its activities had

---

[38] The defendants rely heavily on the phrase "totality of the mandate," as coined by Judge Covello in *Professional Ambulance Service, Inc.* v. *Blackstone*, 35 Conn. Sup. 136, 143, 400 A.2d 1031 (1978), in support of their argument that the water supply statutes, in sum, "specifically commanded or directed" their conduct. We emphasize, however, that § 35-31 (b) immunity requires a statute that addresses the challenged conduct directly and explicitly, and accordingly, is not triggered by implication alone.

[39] Trial court opinions are, "although entitled to serious consideration . . . not binding authority in this court." *Commission on Hospitals & Health Care* v. *Lakoff*, 214 Conn. 321, 333, 572 A.2d 316 (1990). Nevertheless, the trial court cases discussed herein provide particularly cogent illustrations of the correct application of § 35-31 (b), and their inclusion is warranted because that issue has been addressed only once on the appellate level, by this court's decision in *Mazzola*.

been approved by the public utilities commission in accordance with the rate-setting procedure prescribed by § 16-19. Id., 357–58. The court concluded that § 35-31 (b) "has no parallel in the federal antitrust statutes," and that "in enacting this provision the Connecticut legislature also did not choose to follow the example set by several other states of specifically and unqualifiedly exempting from antitrust liability the activities of industries and other organizations subject to the supervision of the state regulatory agency equivalent to our public utilities commission." Id., 359. This court emphasized that § 35-31 (b) was narrower than the holding of *Parker* v. *Brown*, supra, 317 U.S. 350–51, and concluded that the telephone company's activities satisfied neither standard because under the public utility rate-setting process of § 16-19, "the role that is statutorily assigned to the [public utility commission] in rendering effective tariffs proposed by companies such as the defendant amounts to little more than acquiescence in a program originated by the defendant. In no sense, then, can activities of the defendant such as the kind of activities challenged by the plaintiff, purportedly authorized by a tariff filed with and approved by the [public utility commission], be characterized as 'compelled by direction of the [s]tate acting as a sovereign' under the *Parker* doctrine as it has been judicially interpreted." Id., 365–66.

In *Professional Ambulance Service, Inc.* v. *Blackstone*, 35 Conn. Sup. 136, 137, 400 A.2d 1031 (1978), the plaintiff was a private ambulance company who, along with two other private ambulance companies, previously had been dispatched by the East Hartford police department on a rotating basis to provide emergency medical services to the town. The defendant mayor of East Hartford subsequently notified the plaintiff that the state office of emergency medical services and the North Central Emergency Medical Services Council had

designated another ambulance company, the Ambulance Service of Manchester, Inc., as the " 'R-2 service company for East Hartford,' " which meant that only it could provide emergency ambulance service in the town. Id., 138. The mayor then issued to the police department a directive to that effect, and the police thereafter notified only Ambulance Service of Manchester, Inc., when ambulance service was needed. Id. The town also "passed an ordinance prohibiting ambulance companies from advertising their services as 'emergency services' or 'emergency personnel.' As a result, the plaintiff . . . noted a significant reduction in the number of its calls for emergency ambulance services with a corresponding loss in revenues." Id. The plaintiff then brought a state antitrust action, claiming that "the designation of Ambulance Service of Manchester, Inc., as the single R2 responder for the East Hartford primary service area and the prohibition against advertising have had the effect of creating a monopoly and are in violation of these antitrust statutes." Id., 140.

The trial court, *Covello, J.*, relied on *Mazzola*, and concluded that, "the parties sought to be enjoined from alleged antitrust activities are not the officers of a private company regulated by a state agency, but are the officials of the state and municipal agencies themselves, pursuing emergency medical service functions directed by the statutes." Id., 142. The court stated that the ambulance service regulations at issue were promulgated pursuant to the "totality of the mandate set out" in the emergency medical services statutes. Id., 143. It concluded that the mayor's activities "represent the product of specifically directed state action," namely, regulations restricting ambulance advertising and ambulance primary service areas.[40] Id.

---

[40] The trial court in *Professional Ambulance Service, Inc.* v. *Blackstone,* supra, 35 Conn. Sup. 138–39, stated that the mayor's actions were "the product of the implementation of a series of state regulations promulgated by the Connecticut department of health in furtherance of the emergency medical services program authorized by General Statutes [§] 19-73u et seq.

We next consider the more recent federal District Court decision, also authored by Judge Covello, in *Wheelabrator Environmental Systems, Inc.* v. *Galante,* United States District Court, Docket No. 3:97CV01040, 2000 WL 863029 (D. Conn. March 31, 2000). The plaintiff and the defendants in that case were waste management companies, and the plaintiff had entered into an agreement with the Housatonic Resources Recovery Authority (recovery authority), an organization with eleven member municipalities that had "joined together to arrange for the orderly disposal of municipal solid waste . . . in accordance with state and regional solid waste plans." Id., *1. The defendants provided waste management services to some of the recovery authority municipalities by processing the waste and delivering it to the plaintiff's facilities to be burned and to generate electricity. Id., *2. The plaintiff brought a breach of contract action against the defendants, claiming that they failed to deliver waste to the plaintiff's management facility as was required by their contract. Id. The defendants counterclaimed against the plaintiff, arguing that it violated the Connecticut Antitrust Act and the

---

[now General Statutes § 19a-175 et seq.]. [General Statutes §] 19-73ce [now General Statutes § 19a-183] authorizes the establishment of a series of regional emergency medical service councils. The council for the geographic area which includes East Hartford is known as the North Central Emergency Medical Services Council. . . .

"Among their other duties, those councils are required by state regulation to designate so-called 'Primary Service Areas' for the various communities within their region. A primary service area . . . is simply a defined or known geographic area. [Sections] 19-73w-404 (B) and 19-73w-400 (D) [of the Regulations of Connecticut State Agencies] both require that within each primary service area there shall be only one firm assigned for a given category of service."

The court also noted § 19-73w-307 of the Regulations of Connecticut State Agencies, which provided: " 'Ambulance services shall not advertise emergency medical services or emergency personnel for any political subdivision which has designated a phone number to be used to obtain EMS [Emergency Medical Service]. . . .' " *Professional Ambulance Service, Inc.* v. *Blackstone,* supra, 35 Conn. Sup. 140 n.5.

federal Sherman Act in its attempts to preserve its monopoly over trash disposal services in the recovery authority market. Id., *3.

In addressing the plaintiff's argument that the state antitrust counterclaims should be dismissed under § 35-31 (b), the court relied on *Mazzola* and *Professional Ambulance Service, Inc.*[41] Id., *6. The court noted that the "allegedly anticompetitive conduct . . . arises solely from the [plaintiff's] waste agreement with the [recovery authority]." Id. It found the "specific authorization" required under the statute in "the totality of the mandate" of the waste management statutes that: (1) required municipalities to "make provisions for the safe and sanitary disposal of all solid wastes which are generated within [their] boundaries"; General Statutes § 22a-220 (a); and (2) authorized the municipalities to enter into long-term contracts for waste management. General Statutes § 7-273bb (b);[42] see also General Statutes § 22a-221 (a) ("[t]he state, any municipality or any municipal or regional authority may make contracts for the exercise of its corporate or municipal powers with respect to the collection, transportation, separation,

---

[41] The court dismissed the Sherman Act counterclaims after conducting a separate analysis pursuant to *Parker* v. *Brown*, supra, 317 U.S. 341, and its progeny. *Wheelabrator Environmental Systems, Inc.* v. *Galante*, supra, 2000 WL 863029, *8.

[42] General Statutes § 7-273bb (b) gives powers to municipal and regional resource recovery authorities and provides: "It is the intention of this chapter that the authorities shall be granted all powers necessary to fulfill the purposes of this chapter and to carry out their assigned responsibilities and that the provisions of this chapter are to be construed liberally in furtherance of this intention." See also General Statutes § 7-273bb (a) (12) (recovery authority may "do all things necessary for the performance of its duties, the fulfillment of its obligations, the conduct of its operations, the maintenance of its working relationships with the state, other municipalities, regions and persons, and the conduct of a comprehensive program for solid waste disposal and resources recovery, and for solid waste management services, in accordance with the provisions of the state or local solid waste management plan, applicable statutes and regulations and the requirements of this chapter").

volume reduction, processing, storage and disposal of its solid wastes for a period not exceeding thirty years and may pledge its full faith and credit for the payment of obligations under such contracts").[43]

We conclude that the present case is readily distinguishable from *Professional Ambulance Service, Inc.*, and *Wheelabrator Environmental Systems, Inc.*, because, in those cases, the applicable statutes and regulations spoke directly to all of the challenged conduct. In *Professional Ambulance Service, Inc.*, the applicable regulations gave the town no choice except to designate one emergency ambulance service provider, and the advertising ordinance was authorized by a regulation directly on point. Similarly, in *Wheelabrator Environmental Systems, Inc.*, it was the very existence of the waste manager's contract with the municipality that was the sole challenged conduct, which was plainly and specifically authorized by statute.

In contrast, the plaintiffs in the present case have alleged sufficient facts, viewed in the context of the

[43] In contrast, we note *Interstate Aviation, Inc.* v. *Meriden*, Superior Court, judicial district of New Haven at Meriden, Docket No. CV92-0240874S (May 26, 1995), wherein the plaintiff unsuccessfully bid on the opportunity to operate a municipal airport. The plaintiff brought an action against the city and the successful bidder, claiming violations of municipal competitive bidding laws and antitrust statutes. With respect to the antitrust claims, the city claimed immunity pursuant to § 35-31 (b), and moved for summary judgment. The trial court denied the motion for summary judgment, relying on *Mazzola* and concluding that the statute, General Statutes § 13b-43, provided only that "[a]ny municipality . . . may establish, maintain and operate an airport at any location within the state approved by the commissioner and by the municipality or municipalities within which such airport is to be established, and may take any land or interest therein necessary for such establishment at such location upon paying just compensation to the owner of such land or interest therein. . . ." The court stated that the "use of the term 'may' does not support the notion that such action is specifically directed or required by statute," and also that because the enabling legislation provided for acquisition of competitors, but only "in exchange for payment, it 'very clearly negates any defense claim of entitlement to impunity or immunity.'" *Interstate Aviation, Inc.* v. *Meriden*, supra.

statutory and regulatory scheme, to render improper the trial court's grant of the defendants' summary judgment motion. Although the statutes plainly envision *retail* monopolies through the designation of exclusive service areas, and some of the defendants' conduct was in fact mandated, namely, the inclusion of the pond in their water supply plans; see General Statutes § 25-32d (b) (3); Regs., Conn. State Agencies § 25-33h-1 (d) (2) (A) (ii); the remainder of the facts allege anticompetitive conduct well beyond the pale of the statutes, and therefore, not immune under § 35-31 (b). Our reading of the statutes, which are quite comprehensive, reveals no mention of, for example: (1) authorization for contract clauses requiring water company parties to "use their best efforts to deter the construction and operation of new independent water systems"; and (2) manipulation of water supply figures in order to avert the declaration of a supply emergency, thus opening a previously closed market for additional water sources. Accordingly, action by state regulatory authorities in this case was limited to *acquiescence* to the defendants' anticompetitive activities with respect to the relevant wholesale water market, which, like the telephone rate approval process considered in *Mazzola* v. *Southern New England Telephone Co.*, supra, 169 Conn. 344, does not supply the state direction required for immunity under § 35-31 (b).

The judgment is reversed and the case is remanded to the trial court with direction to deny the defendants' motion for summary judgment and for further proceedings according to law.

In this opinion BORDEN, PALMER and VERTEFEUILLE, Js., concurred.

SULLIVAN, C. J., concurring. I agree with the result reached by the majority, but disagree with its method

of statutory analysis. This case requires us to resolve an apparent inconsistency in the antitrust statutes. While General Statutes § 35-31 (b)[1] provides that the antitrust provisions of chapter 624 do not apply to activities that are "specifically directed or required by a statute of this state, or of the United States," General Statutes § 35-44b[2] provides that, in interpreting the antitrust provisions, "the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes." As the defendants, the city of New London, the town of Waterford and their respective water pollution control authorities, point out, federal courts have concluded that the state action exemption applies to municipal activities that are the " 'foreseeable result' of what the statute authorizes." *Electrical Inspectors, Inc.* v. *East Hills*, 320 F.3d 110, 119 (2d Cir. 2003). The statutory authorization need not be explicit. See id.

The defendants argue, in effect, that the plain and unambiguous language of both statutes cannot be given effect and, therefore, federal state action immunity standards should be read into § 35-31 (b), contrary to the plain language of that statute. The apparent inconsistency between these statutes can be reconciled, however, by application of the principle that "[w]here statutes contain specific and general references covering the same subject matter, the specific references prevail over the general."[3] *Galvin* v. *Freedom of Infor-*

---

[1] General Statutes § 35-31 (b) provides: "Nothing contained in this chapter shall apply to those activities of any person when said activity is specifically directed or required by a statute of this state, or of the United States."

[2] General Statutes § 35-44b provides: "It is the intent of the General Assembly that in construing sections 35-24 to 35-46, inclusive, the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes."

[3] The majority applies this principle to conclude that § 35-31 (b) should apply over the more general provisions of the Sherman Act, 15 U.S.C. § 1, as construed by the federal courts. I disagree. Federal antitrust law pertaining to state action immunity is more lenient than § 35-31 (b), but is just as specific. The reason that we should not follow federal law in this case is

*mation Commission*, 201 Conn. 448, 456, 518 A.2d 64 (1986). Because § 35-31 (b) is more specific than § 35-44b, its terms should prevail in this case. Thus, there is no need to go beyond the plain and unambiguous language of the statute. See General Statutes § 1-2z ("The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does

---

that the provisions of § 35-31 (b) are more specific than the provisions of § 35-44b and, therefore, to the extent that there is a patent inconsistency between the plain language of § 35-31 (b) and the federal law, the provisions of § 35-44b requiring us to follow federal law do not apply. I recognize that § 35-44b requires us, as a threshold matter, to compare the plain language of § 35-31 (b) with the relevant federal law to determine whether such an inconsistency exists in the first instance. Once it has been determined that such an inconsistency exists, however, we are no longer bound by § 35-44b in construing the meaning of § 35-31 (b).

The majority argues that my analysis is internally inconsistent because the canon of statutory construction providing that specific statutes prevail over more general statutes is, itself, a form of " 'extratextual evidence . . . .' " See footnote 25 of the majority opinion. I disagree. I believe that "we may apply the ordinary canons of judicial construction in *seeking* the plain meaning" of the statutory scheme. (Emphasis added.) *State* v. *Courchesne*, 262 Conn. 537, 634, 816 A.2d 562 (2003) (*Zarella, J.*, dissenting, joined by *Sullivan, C. J.*). Thus, this canon informs us, before we ever look to federal law, that if there is an inconsistency between federal law and § 35-31 (b), § 35-31 (b) prevails over § 35-44b.

Finally, the majority argues that the canon providing that the specific prevails over the general does not apply because § 35-31 (b) and § 35-44b are fundamentally different. At the heart of the majority's analysis, however, is its recognition that the general rule that we follow federal precedent when interpreting the Connecticut Antitrust Act does not apply when the specific text of our antitrust statutes requires us to do otherwise. See *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 15–16, 664 A.2d 719 (1995). This is an application of the very canon that the majority purports to reject. Thus, my disagreement with the majority is not with its general approach to the issue or its conclusion, but with its apparent unwillingness to state simply and explicitly that, because the language of § 35-31 (b) is plain and unambiguous, we are bound by that language and, because § 35-31 (b) is more specific than § 35-44b, we are not bound by § 35-44b.

not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."). Accordingly, I believe that the statutory analysis should begin and end with the application of § 1-2z. I see no need for the majority's lengthy "examination of the interplay . . . between federal case law . . . governing state action immunity, and the statutory state action immunity standard set forth by § 35-31 (b)" or its application of the standards set forth in *Manifold* v. *Ragaglia*, 272 Conn. 410, 419, 862 A.2d 292 (2004) (this court's "fundamental objective is to ascertain and give effect to the *apparent intent* of the legislature" [emphasis added; internal quotation marks omitted]) and *Jagger* v. *Mohawk Mountain Ski Area, Inc.*, 269 Conn. 672, 679, 849 A.2d 813 (2004) (court looks to "words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter" [internal quotation marks omitted]).