WYATT ENERGY, INC. *v.* MOTIVA
ENTERPRISES, LLC, ET AL.
(AC 31917)
(AC 31918)

Gruendel, Robinson and Pellegrino, Js.

Argued March 22—officially released May 17, 2011

Robert A. Izard, Jr., and Mark P. Kindall, for the appellant (plaintiff).

Sheila A. Huddleston and Paul D. Sanson, with whom, on the brief, was Robert R. Simpson, for the appellees (defendants).

*Opinion*

GRUENDEL, J. In this breach of contract action, the plaintiff, Wyatt Energy, Inc. (Wyatt), appeals from the judgment of the trial court, rendered after a bench trial, in favor of the defendants, Motiva Enterprises, LLC (Motiva), Shell Oil Company and its successor Shell Oil Products Company, LLC (Shell) and Equiva Trading Company.[1] On appeal, Wyatt claims that the court improperly (1) failed to consider whether its conduct in breach of contract was justified by a potential antitrust violation, (2) applied an incorrect legal standard in determining the relevant product and geographic markets applicable to the court's antitrust analysis, (3) failed to find an actual antitrust violation justifying its conduct, (4) concluded that its conduct constituted a

---

[1] Throughout this opinion, we refer to the parties individually by name and to the defendants collectively as the defendants.

breach of contract and (5) awarded Motiva damages based on speculation. We disagree and, accordingly, affirm the judgment of the trial court.

The present dispute is the result of a series of events over one decade in the making. On May 1, 1997, Wyatt and Shell entered into an agreement (agreement) for Shell's exclusive use of logistical and storage services associated with Wyatt's port terminal (Wyatt terminal), located in New Haven harbor. The agreement was to run for ten years, from May 1, 1997, through April 30, 2007. Additionally, the agreement included the following operative provisions:

"F) RIGHT OF FIRST REFUSAL

"If . . . Wyatt receives or solicits a bona fide written offer of purchase for the [Wyatt terminal] which Wyatt intends to accept, it shall provide Shell with written notice thereof, together with a copy of such written offer. Shell shall have the excusive right and option within forty-five (45) days of the date of its receipt of such written notice to enter into a binding agreement with Wyatt for the purchase of the [Wyatt terminal] . . . upon the terms and conditions set forth in such written offer. . . . Wyatt shall be free to sell the [Wyatt terminal] to [a] third party [provided that] . . . [a]ny such third party shall be bound to accept assignment of this [a]greement and honor all terms and obligations [thereto] . . . .

\* \* \*

"13. DEFAULT

"Upon default, the non-defaulting party shall, within thirty (30) days of knowledge thereof, notify, in writing, the defaulting party of the particulars of such default and the defaulting party shall have thirty (30) days thereafter to cure such default. . . ."

In September, 1998, Shell assigned its interest in the agreement to Motiva. In August, 1999, Wyatt was approached by Williams Energy Ventures, Inc. (Williams Energy),[2] regarding a possible purchase of the Wyatt terminal and, on November 3, 1999, Williams Energy submitted a nonbinding proposal to Wyatt to purchase the Wyatt terminal for between $30.75 million and $32 million. Motiva, which had independently assessed the value of the Wyatt terminal at between $14 million and $20 million, was unwilling to match Williams Energy's proposed purchase offer as of November, 1999. Additionally, in May, 2000, Motiva purchased the port terminal owned by Cargill, Inc. (Cargill terminal), which also was located in New Haven harbor.

On June 8, 2000, Wyatt wrote to Motiva, claiming that Motiva's purchase of the Cargill terminal undermined the purpose of the agreement, which, according to Wyatt, was that in exchange for Wyatt granting Motiva complete control over the Wyatt terminal, Motiva would use the Wyatt terminal as its sole terminal in the New Haven area.[3] On June 15, 2000, Williams Energy advised Wyatt that, given Motiva's exclusive rights under the agreement, the value of the Wyatt terminal was $15.7 million, but that were the agreement not in place, the value of the Wyatt terminal would be worth approximately double, or $31.375 million. Soon thereafter, on June 22, 2000, Williams Energy tendered to Wyatt its first binding written offer to purchase the Wyatt terminal for $31.375 million, based on Wyatt's representations that it had the right to terminate the agreement and, in fact, that Wyatt had taken action in doing so. The following day, June 23, 2000, Wyatt wrote to Motiva,

---

[2] Williams Energy subsequently changed its name to Magellan Terminal Holdings, L.P.

[3] Despite Wyatt's assertions, the agreement does not require explicitly that Motiva use only the Wyatt terminal. Rather, it is Wyatt that it is bound explicitly to offer the Wyatt terminal for Motiva's exclusive use.

unilaterally terminating the agreement due to what Wyatt claimed to be Motiva's material breaches thereto.[4] On September 1, 2000, Wyatt sold the Wyatt terminal to Williams Energy without requiring Williams Energy to assume Wyatt's obligations under the agreement.

Shortly after Motiva's receipt of Wyatt's termination notice, Motiva sent Wyatt a demand for arbitration, alleging that Wyatt's conduct constituted a breach of the agreement.[5] In response, on July 23, 2002, Wyatt filed suit against Motiva, alleging, inter alia, breach of contract.[6] Motiva then filed, inter alia, a counterclaim against Wyatt for breach of contract, claiming that Wyatt had committed a material breach of the agreement when, "[w]ithout proper cause, Wyatt unilaterally terminated the [agreement] on June 23, 2000." In reply to Motiva's counterclaim, Wyatt asserted, inter alia, a special defense of illegality premised on alleged antitrust violations stemming from Motiva's purchase of the Cargill terminal.[7] On August 29, 2003, Motiva moved for summary judgment on, inter alia, Wyatt's special defense of illegality, which the court granted on December 8, 2003, precluding Wyatt from presenting a special defense of illegality in the ensuing bench trial.

[4] Specifically, Wyatt alleged that by "purchasing the [Cargill] terminal . . . and . . . in effect, stating that it [would] not use the Wyatt [terminal exclusively] as contemplated by the [a]greement," Motiva's conduct amounted to a material breach. Contrary to that assertion, we note that no provision of the agreement limits Motiva's right to purchase and/or utilize terminals other than the Wyatt terminal.

[5] Section 14 of the agreement called for mandatory arbitration in the event of a claim "arising out of or related to the [a]greement . . . ."

[6] All of the causes of action brought originally by Wyatt were subsequently withdrawn or found subject to arbitration under the agreement.

[7] Initially, Wyatt asserted that Motiva's acquisition of the Cargill terminal rendered the agreement illegal under three provisions of the Connecticut Antitrust Act (antitrust act), General Statutes § 35-24 et seq., specifically §§ 35-26, 35-27 and 35-29. At the 2009 bench trial and in this appeal, however, Wyatt relies only on §§ 35-26 and 35-27 as the basis for its special defense of illegality.

Following a bench trial on Motiva's counterclaim for breach of contract, the court rendered judgment in favor of Motiva and Wyatt appealed to this court, claiming, inter alia, that the trial court had improperly granted Motiva's motion for summary judgment with respect to Wyatt's special defense of illegality. In reversing the trial court's judgment and remanding the case for a new trial, this court held that Wyatt was entitled to present evidence that, as a party to the agreement, it may be subject to liability given the potential antitrust violations associated with Motiva's acquisition of the Cargill terminal. See *Wyatt Energy, Inc.* v. *Motiva Enterprises, LLC*, 104 Conn. App. 685, 700–701, 936 A.2d 280 (2007), cert. denied, 286 Conn. 901, 943 A.2d 1103 (2008).

Accordingly, on remand, Wyatt was permitted to present evidence as to its special defense of illegality during a new bench trial that took place over three weeks, from June 8 to June 26, 2009. Nonetheless, following posttrial briefing, the court, in its January 11, 2010 memorandum of decision, concluded that Wyatt had failed to prove the elements of its special defense of illegality, rendering judgment in favor of Motiva on its counterclaim for breach of contract. In addition to awarding Motiva approximately $2.6 million in damages and $1.7 million in attorney's fees and costs, the court granted the defendants' motion for prejudgment interest in the amount of $814,303.72. These appeals followed. Additional facts will be set forth as necessary.

I

Wyatt's first claim is that the court improperly failed to consider whether its conduct in breach of the agreement was justified by a potential, as opposed to an actual, antitrust violation. Specifically, Wyatt argues that the trial court incorrectly read this court's decision in *Wyatt Energy, Inc.*, as requiring that, for Wyatt to prevail on its special defense of illegality, it had to prove

the existence of an *actual* antitrust violation, rather than showing that its conduct in breach of the agreement was justified by an objectively reasonable belief that Motiva's purchase of the Cargill terminal created a *potential* antitrust violation. Our review of *Wyatt Energy, Inc.*, as well as the trial court's memorandum of decision rejecting Wyatt's special defense, demonstrates clearly that Wyatt's first claim is without merit.

The principle issue addressed in *Wyatt Energy, Inc.*, was the propriety of the trial court's decision granting summary judgment in favor of Motiva on Wyatt's special defense of illegality. *Wyatt Energy, Inc.* v. *Motiva Enterprises, LLC*, supra, 104 Conn. App. 692–701. In concluding that the trial court incorrectly had precluded Wyatt from presenting its special defense during the initial trial, this court made three definitive rulings in *Wyatt Energy, Inc.* First, as a preliminary issue, the trial court in *Wyatt Energy, Inc.*, incorrectly applied Texas law,[8] rather than Connecticut law, "when determining whether illegality in fact did exist in this particular case." Id., 695. Second, "under the circumstances of the present case, in which antitrust violations

---

[8] Although the agreement called explicitly for the application of Texas substantive law in determining the "rights and obligations of the parties" under the agreement, this court explained in *Wyatt Energy, Inc.*, that, because Wyatt's special defense of illegality was premised on alleged violations of the antitrust act, Connecticut law governed the "threshold inquiry into the existence of illegality . . . ." *Wyatt Energy, Inc.* v. *Motiva Enterprises, LLC*, supra, 104 Conn. App. 696. Additionally, we note that for purposes of appellate review of Wyatt's claims in the present case, our analysis is governed by Connecticut law. We note further that General Statutes § 35-44b provides: "It is the intent of the General Assembly that in construing sections [of the antitrust act] the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes." "Accordingly, we follow federal precedent when we interpret the [antitrust act] unless the text of our antitrust statutes, or other pertinent state law, requires us to interpret it differently." *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 15–16, 664 A.2d 719 (1995).

are alleged . . . the legality of the . . . agreement and the determination concerning its capability of being performed lawfully [could not] be ascertained by looking only to the time of its formation." Id., 697–98. And finally, summary judgment was improper because "genuine issues of fact exist[ed] . . . concerning whether the . . . agreement [was] related to an unlawful arrangement or combination in restraint of competition." Id., 699–700.

Despite Wyatt's claim to the contrary in the present case, this court's holding in *Wyatt Energy, Inc.*, does not stand for the proposition that Wyatt could prevail on its special defense of illegality by showing merely that it had an objectively reasonable basis to believe that Motiva's acquisition of the Cargill terminal created the *possibility* of an antitrust act violation. Indeed, the focus of this court's holding in *Wyatt Energy, Inc.*, was whether Wyatt could show that Motiva's acquisition of the Cargill terminal violated the antitrust act, specifically §§ 35-26 and 35-27.[9] See id., 692–700. Under both §§ 35-26 and 35-27, Wyatt's perception, either objective or subjective, of how Motiva's acquisition of the Cargill terminal affected the legality of the agreement under the antitrust act is a nonissue. Rather, the issue is whether Motiva's acquisition of the Cargill terminal *actually* rendered the agreement unlawful under either of those provisions of the antitrust act. The fact that this court stated in *Wyatt Energy, Inc.*, that "Wyatt . . . had an interest in being able to put on [its special] defense at trial because, as a party to a contract that created . . . a potentially violative combination, it might have exposure under our antitrust laws"; id., 700 n.12; did not

[9] General Statutes § 35-26 provides: "Every contract, combination, or conspiracy in restraint of any part of trade or commerce is unlawful."

General Statutes § 35-27 provides: "Every contract, combination, or conspiracy to monopolize, or attempt to monopolize, or monopolization of any part of trade or commerce is unlawful."

excuse Wyatt from proving the essential element of its special defense—an actual antitrust act violation. It would be disingenuous to conclude, as Wyatt argues, that Wyatt could prevail on its special defense by showing merely a *potential violation* of § 35-26 or § 35-27. Moreover, the court's memorandum of decision analyzes thoroughly Wyatt's special defense of illegality with respect to the standards applicable to §§ 35-26 and 35-27, an analysis in complete accord with our holding in *Wyatt Energy, Inc.* Accordingly, Wyatt's claim is without merit.

## II

Next, Wyatt claims that the court applied an incorrect legal standard in determining the relevant product and geographic markets applicable to the court's antitrust analysis. Specifically, Wyatt argues that by incorrectly defining the relevant product and geographic markets, the court's antitrust analysis was fundamentally flawed, thereby warranting reversal and a new trial. We disagree.

The following additional facts are relevant to the disposition of this claim. To consider adequately the nature of Wyatt's special defense of antitrust violations, the court was called upon to make a threshold determination as to the relevant product and geographic markets that govern a substantive antitrust analysis. Indeed, without first defining the relevant product and geographic markets applicable to alleged antitrust violations, the court would not be in a position to determine whether antitrust act violations were occurring, or had occurred previously. See *Bridgeport Harbour Place I, LLC* v. *Ganim,* 111 Conn. App. 197, 201, 958 A.2d 210 (2008), cert. granted, 290 Conn. 906, 962 A.2d 793 (2009); see also *Brown Shoe Co.* v. *United States,* 370 U.S. 294, 324, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962). As such, both parties presented extensive expert testimony in

advance of their respective definitions of the relevant product and geographic markets applicable to Wyatt's antitrust defense.

Specifically, Wyatt presented the testimony of Michael A. Williams, an economist retained to "evaluate the competitive implications of Motiva's acquisition of the Cargill terminal." Williams described that in evaluating Motiva's acquisition of the Cargill terminal, his analysis of the relevant product market was limited to "terminalling services"—or logistical services that both Wyatt and Motiva provide to third-party end users. Additionally, with respect to the relevant geographic market, Williams, in applying a conservative approach, focused his analysis on the state of Connecticut. Utilizing these market definitions, Williams opined that Motiva's acquisition of the Cargill terminal "likely would have led to the exercise of substantial market or monopoly power by Motiva . . . ."

At the conclusion of Williams' testimony, the court heard from Motiva's expert economist, Joseph P. Kalt, regarding his opinions of the "competitive implications" of Motiva's acquisition of the Cargill terminal. Although Kalt also focused on terminalling services for purposes of defining the relevant product market, he explained that such services could not be viewed in isolation when conducting an antitrust analysis. Rather, Kalt described how different checks and balances within the terminalling services product market affected the competitive implications involved with the Motiva-Cargill transaction. Similarly, with respect to geographic market considerations, Kalt's analysis did not focus exclusively on Connecticut, but also included other regional markets, particularly Rhode Island. In sum, Kalt opined that "based on the realities of this industry and this marketplace and the nature of the competition . . . [Motiva's] acquisition of Cargill . . . did not portend

[a substantial danger of anticompetitive] market power or monopoly . . . ."

In its memorandum of decision, the court explained that, with respect to defining the relevant product and geographic markets applicable to Wyatt's antitrust allegations, Kalt's testimony was more credible than that of Williams. Specifically, the court ruled that on the basis of the expert testimony presented, "Wyatt did not prove that had it not terminated the . . . [a]greement, Motiva's acquisition of the Cargill [t]erminal gave Motiva market power . . . within the relevant product market" in violation of the antitrust act. In so ruling, the court reviewed in detail the nature of Kalt's testimony within the context of the particular antitrust act violations advanced by Wyatt in its special defense. Thus, on the basis of the product and geographic market definitions articulated by Kalt, the court concluded that Wyatt had not proven a violation of either § 35-26 or § 35-27.

Wyatt now claims that by adopting Kalt's definitions of the relevant product and geographic markets, the court applied an incorrect legal standard when reviewing Wyatt's allegations of antitrust act violations. As Wyatt argues, by adopting incorrect definitions of the relevant product and geographic markets, the court's antitrust analysis was fundamentally flawed.

We begin by setting forth our standard of review. "[P]roper analysis in an antitrust case first requires [a] determination of the relevant market . . . . The relevant market for purposes of antitrust litigation is the area of effective competition within which the defendant operates." (Citations omitted; internal quotation marks omitted.) *Miller's Pond Co., LLC* v. *New London,* 273 Conn. 786, 814, 873 A.2d 965 (2005). "The area of effective competition must be determined by reference

to a product market (the line of commerce) and a geographic market (the section of the country)." (Internal quotation marks omitted.) *Brown Shoe Co.* v. *United States*, supra, 370 U.S. 324. "Market definition generally is a deeply fact-intensive inquiry . . . ." (Internal quotation marks omitted.) *Miller's Pond Co., LLC* v. *New London*, supra, 814.

"Questions of fact are subject to the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence . . . we give great deference to its findings." (Internal quotation marks omitted.) *Reiner, Reiner & Bendett, P.C.* v. *Cadle Co.*, 278 Conn. 92, 107, 897 A.2d 58 (2006); see also Practice Book § 60-5. "The weight to be given to the evidence and to the credibility of witnesses is solely within the determination of the trier of fact. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *DiRienzo Mechanical Contractors, Inc.* v. *Salce Contracting Associates, Inc.*, 122 Conn. App. 163, 176, 998 A.2d 820, cert. denied, 298 Conn. 910, 4 A.3d 831 (2010).

In the present case, the essence of Wyatt's claim is that by rejecting its expert's definitions of the relevant product and geographic markets, the court's antitrust analysis was improper. Wyatt contends that, given Williams' testimony, the court incorrectly found that the relevant product and geographic markets extended

beyond terminalling services and Connecticut, respectively. The record is clear, however, that the court did engage in a deeply fact intensive inquiry when defining the relevant product and geographic markets applicable to Wyatt's special defense. See *Miller's Pond Co., LLC* v. *New London*, supra, 273 Conn. 814. The record is equally clear that the court's decision to credit explicitly the testimony of Motiva's expert, rather than that of Wyatt's, is supported adequately by the evidence in this case. Although Wyatt may disagree with the court's decision to define the relevant product and geographic markets according to Kalt's reasoning, there is nothing improper in the way the court's antitrust analysis proceeded. To the contrary, our review of the record confirms that the court's decision to adopt Kalt's definitions of the product and geographic markets was based on a thorough consideration of all of the relevant expert testimony presented. Therefore, we conclude that the court's determination with respect to the relevant product and geographic markets finds ample support in the record and the court's findings attendant thereto are not clearly erroneous. Accordingly, Wyatt's claim to the contrary fails.

### III

Next, Wyatt argues that the court improperly failed to conclude that Motiva's acquisition of the Cargill terminal resulted in actual antitrust violations. Specifically, Wyatt contends that the court ignored evidence that, after acquiring the Cargill terminal, Motiva engaged in clearly anticompetitive behavior as circumscribed by the antitrust act, particularly the intentional reduction of business activity at the Wyatt terminal. We are not persuaded.

Disposition of this claim does not require a protracted analysis. The entirety of Wyatt's principal brief addressing this claim is premised on the argument that,

"subsequent to Motiva's purchase of the Cargill terminal, [Motiva] was using its control over the Wyatt [terminal] to reduce [business activity] at the Wyatt terminal . . . ." This argument focuses on the allegedly anticompetitive effects that Wyatt suffered as a result of Motiva's acquisition of the Cargill terminal. It is undisputed, however, that to prevail on its special defense, Wyatt was required to demonstrate more than an *individualized* harm. Because "[t]he antitrust laws protect consumers by prohibiting agreements that unreasonably restrain overall competition . . . in order to fulfill the requirement of showing an actual adverse effect in the relevant market, the plaintiff must show more than just that he was harmed by the defendant's conduct." (Internal quotation marks omitted.) *Clorox Co.* v. *Sterling Winthrop, Inc.*, 117 F.3d 50, 57 (2d Cir. 1997). Therefore, assuming arguendo the veracity of Wyatt's claim that Motiva's acquisition of the Cargill terminal resulted in anticompetitive effects at the Wyatt terminal, Wyatt would nonetheless be unsuccessful in demonstrating violations of the antitrust act. By failing to prove that Motiva's acquisition of the Cargill terminal resulted in actual anticompetitive effects in the *relevant market*, Wyatt could not prevail on its special defense. See *George Haug Co.* v. *Rolls Royce Motor Cars, Inc.*, 148 F.3d 136, 139 (2d Cir. 1998) ("[t]he antitrust injury requirement obligates a plaintiff to demonstrate, as a threshold matter, that the challenged action had an *actual* adverse effect on competition as a whole in the relevant market; to prove that it has been harmed as an individual competitor will not suffice" [emphasis in original; internal quotation marks omitted]). Accordingly, Wyatt's claim cannot be sustained.

## IV

Wyatt next claims that the court improperly concluded that by unilaterally terminating the agreement and selling the Wyatt terminal to Williams Energy, Wyatt

committed a material breach of the agreement. Specifically, Wyatt argues that by acquiring the Cargill terminal and expressing a persistent unwillingness to exercise its right of first refusal under paragraph F, Motiva anticipatorily repudiated the agreement, thereby excusing Wyatt's continued performance thereof. We disagree.

The following additional facts are relevant to the disposition of this claim. During trial, Motiva alleged, inter alia, that by failing to provide notice of the particulars of its default under the agreement and by failing to provide a thirty day cure period to remedy the alleged defaults, Wyatt materially breached paragraph 13 of the agreement.[10] In opposition, Wyatt maintained that its continued performance under the agreement was excused by Motiva's anticipatory repudiation in purchasing the Cargill terminal and, "in effect, stating [that Motiva would] not use the Wyatt [terminal exclusively] as contemplated by the [a]greement." (Internal quotation marks omitted.)

In its memorandum of decision, the court rejected Wyatt's anticipatory repudiation argument, finding that "[t]here was no credible evidence presented excusing Wyatt of its obligation to provide Motiva time to cure" under paragraph 13 of the agreement. As the court explained, "[a]ssuming arguendo that the June 23, 2000 letter to Motiva set out the particulars of material breaches to the [a]greement on the part of Motiva, Motiva still had thirty . . . days thereafter to cure such default as clearly set out in [paragraph] 13 . . . ."

[10] Additionally, Motiva alleged, and the court agreed, that by failing to assign its agreement obligations to Williams Energy upon sale of the Wyatt terminal, Wyatt committed a material breach of paragraph F of the agreement. Wyatt has not addressed this aspect of the court's ruling with respect to its breach of the agreement on appeal. Instead, Wyatt relies on its claim that the entirety of its obligations under the agreement was excused by Motiva's anticipatory repudiation thereof. Accordingly, our analysis is limited to Wyatt's anticipatory repudiation claim with respect to paragraph 13 only.

(Internal quotation marks omitted.) As such, the court concluded that Wyatt's unilateral termination of the agreement constituted a material breach pursuant to paragraph 13.

Before addressing the merits of Wyatt's claim, we begin by setting forth the standard of review and legal principles governing our analysis. "A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties [to a contract] is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity. . . . [C]ourts do not unmake bargains unwisely made. Absent other infirmities, bargains moved on calculated considerations, and whether provident or improvident, are entitled nevertheless to sanctions of the law. . . . Although parties might prefer to have the court decide the plain effect of their contract contrary to the agreement, it is not within its power to make a new and different agreement . . . . As stated by our Supreme Court, a presumption that the language used is definitive arises when . . . the contract at issue is between sophisticated parties and is commercial in nature. . . .

"Whether there was a breach of contract is ordinarily a question of fact. . . . We review the court's findings of fact under the clearly erroneous standard. . . . The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and

the pleadings in the record as a whole." (Citation omitted; internal quotation marks omitted.) *Neubig* v. *Luanci Construction, LLC,* 124 Conn. App. 425, 432–33, 4 A.3d 1273 (2010).

Here, Wyatt claims that "Motiva's decision to buy the Cargill terminal, move all of its customers to that terminal and block Wyatt from competing for their business was an anticipatory repudiation of the very essence of the [a]greement . . . ." As Wyatt argues, Motiva's anticipatory repudiation of the agreement excused its continued adherence to the terms thereof, including paragraph 13. As a manifestation of the parties' intent, however, the essence of the agreement is to be interpreted, whenever possible, according to its terms. See *William Raveis Real Estate, Inc.* v. *Newtown Group Properties Ltd. Partnership,* 95 Conn. App. 772, 776, 898 A.2d 265 (2006) ("[a] contract must be construed to effectuate the intent of the parties, which is determined from the language used" [internal quotation marks omitted]). Similarly, the determination of whether a party has breached the terms of an agreement is an analysis rooted in the specific factual circumstances giving rise to a contract dispute as found, in this case, by the trial court. See *Neubig* v. *Luanci Construction, LLC,* supra, 124 Conn. App. 433. In contrast to Wyatt's assertions, the record in the case at bar demonstrates, as a threshold consideration, that Motiva's acquisition of the Cargill terminal was not prohibited by any provision of the agreement itself. Thus, Wyatt's argument that Motiva's acquisition of the Cargill terminal constituted an anticipatory repudiation of the agreement fails at the outset. Nonetheless, assuming arguendo that Motiva had anticipatorily repudiated the agreement, nothing in the record demonstrates that the court's conclusion that "Motiva still had 'thirty . . . days [from the time it was notified of its default] to cure such default' as clearly set out in [paragraph] 13" was clearly erroneous. Indeed, the

record demonstrates unequivocally that the court was completely justified in ruling that Wyatt had failed to comply with paragraph 13 by not allowing Motiva to cure its alleged default within the time provided for under that provision of the agreement. The fact that Wyatt may have perceived Motiva's conduct as immediately excusing its continued performance does not trump the governing protocol provided for by the unambiguous language of paragraph 13. "Although parties might prefer to have the court decide the plain effect of their contract contrary to the agreement, it is not within its power to make a new and different agreement . . . ." (Internal quotation marks omitted.) *Neubig* v. *Luanci Construction, LLC*, supra, 432. Furthermore, where, as here, the contract "is between sophisticated parties and is commercial in nature"; id., 433; there is a "presumption that the language used [in the contract] is definitive . . . ." Id., 432–33.

In sum, we conclude, as did the court, that "[n]othing in the [a]greement stated that Wyatt was excused from providing Motiva the . . . opportunity to cure . . . for any reason including Wyatt's belief that Motiva would not cure the default." In light of the facts as found by the court, as well as the unambiguous language of the agreement, it is readily apparent that the court properly determined that Wyatt's conduct amounted to a material breach. Accordingly, Wyatt's claim fails.

V

Wyatt's remaining claim is that the court improperly awarded Motiva contract damages on the basis of illegitimate speculation and unsupported assumptions. Specifically, Wyatt argues that the court's damages award was, in part, premised on "a hypothetical renewal of [a] third-party contract between Motiva and [the] Citgo [Petroleum Corporation (Citgo)]." We disagree.

The following additional facts are relevant to the resolution of this claim. In support of the damages element of its breach of contract claim, Motiva presented the expert testimony of Daniel Grinstead, an economist and the general manager of strategy and planning and business development for Motiva. Grinstead explained that Citgo was Motiva's primary customer at the Wyatt terminal and, at the time that Wyatt terminated the agreement, Citgo and Motiva were parties to a contract set to expire in approximately two years, or August, 2002 (Citgo contract). The terms of the Citgo contract also called for automatic one year renewals "unless terminated by either party upon one hundred eighty (180) days written notice prior to the commencement of the next term." As Grinstead further explained, given the historical earnings and revenue generated from the Motiva-Citgo relationship, Motiva would have earned a specific gross revenue for the remaining two years of the Citgo contract, had Wyatt not unilaterally terminated the agreement.[11]

In addition to Grinstead, Motiva presented the testimony of Julie Barnett, the manager of product exchange and terminal services for Citgo. Barnett "indicated that Citgo never intended to use any New Haven facility other than the Wyatt terminal at any time . . . [a] statement . . . supported by a later execution of a terminalling agreement between Citgo and Williams Energy" for a three year, automatically renewing, term. Because of the strategic business importance Citgo afforded to its New Haven presence, Barnett testified that Citgo would have continued its relationship with Motiva at the Wyatt terminal "as long as they provided good service." No evidence was presented to show that the

[11] The court found specifically that, pursuant to Texas law, Motiva's damages should be evaluated according to gross revenue, not net profit. Wyatt has not challenged this aspect of the court's decision on appeal.

services provided by Motiva to Citgo were anything less than satisfactory.

On the basis of the testimony presented by Grinstead and Barnett, as well as other evidence offered by Motiva to support its damages claim, the court concluded that, given Wyatt's breach of the agreement on June 23, 2000, Motiva was entitled to damages equal to the lost gross revenue Motiva would have earned from the two years remaining on the Citgo contract. Additionally, although mindful of the possibility that the Motiva-Citgo relationship could end at the expiration of the Citgo contract, Motiva had proven to a reasonable certainty that it would have remained contractual partners with Citgo throughout the ten year term of the agreement but for Wyatt's unjustified termination thereof. Thus, the court also awarded Motiva damages based on historical earnings for the lost revenue it would have earned from its Citgo relationship for the entirety of the approximately seven years remaining under the agreement.

On appeal, Wyatt does not argue that the court incorrectly awarded damages to Motiva for the two years that remained on the Citgo contract at the time Wyatt terminated the agreement. Instead, Wyatt challenges the court's damages award with respect to the five additional years that remained under the agreement after the Citgo contract was set to expire. As Wyatt argues, the court incorrectly "awarded [Motiva] damages based on the lost [revenue] from Citgo . . . for the five years after the expiration of the Citgo contract, based on the assumption that, had the Wyatt-Motiva [a]greement remained in place after Motiva's purchase of the Cargill [t]erminal, Citgo and Motiva would have extended the terms of their original [five] year contract from 2002 through 2007." (Emphasis omitted.)

"It is axiomatic that the burden of proving damages is on the party claiming them. . . . When damages are

claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty. . . . Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty. . . . Although damages often are not susceptible of exact pecuniary computation and must be left largely to the sound judgment of the trier . . . this situation does not invalidate a damage award as long as the evidence afforded a basis for a reasonable estimate by the [trier] of that amount. . . . The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous." (Citation omitted; internal quotation marks omitted.) *Lawson* v. *Whitey's Frame Shop*, 241 Conn. 678, 689–90, 697 A.2d 1137 (1997).

In the present case, we conclude that the court's award of damages for the lost gross revenue that Motiva would have earned for the five years remaining under the agreement after Wyatt's breach thereof through a renewal of the Citgo contract was not clearly erroneous. The court's decision in this regard was premised both on Barnett's testimony that Citgo would have remained a Motiva customer at the Wyatt terminal "as long as [Motiva] provided good service," as well as Grinstead's expert testimony with respect to Motiva's lost gross revenue from the Citgo contract as a result of Wyatt's breach of the agreement. Additionally, given the automatic renewal provision of the Citgo contract, "the existence of the same provision in the Citgo/Williams [Energy] contract . . . Citgo's refusal to move to the Cargill terminal following Motiva's purchase of the Cargill [t]erminal and Citgo's contracting with Williams [Energy] . . . to remain at the Wyatt terminal," proved to a reasonable certainty "that Citgo would have remained a customer of Motiva at the Wyatt terminal" throughout the life of the agreement. Notwithstanding

Wyatt's argument to the contrary, the court's memorandum of decision demonstrates that its award of damages was based not on mere speculation or assumptions, but on its evaluation of the evidence presented in support of Motiva's damages claim; evidence that afforded a basis for a reasonable estimate of Motiva's total damages as sustained by Wyatt's breach of the agreement. See *Lawson* v. *Whitey's Frame Shop*, supra, 241 Conn. 689–90. Accordingly, Wyatt's claim is unavailing.

The judgment is affirmed.

In this opinion the other judges concurred.